# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF NORTH CAROLINA

NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE,
Alamance County Branch; TAMARA O.
KERSEY; COLLEEN TENAE TURNER;
TERENCE COLIN DODD; DESTINY
CLARKE; NERISSA RIVERA; ADAM
ROSE; ANNIE SIMPSON;
GREGORY B. DRUMWRIGHT

        *Plaintiffs*,

    v.

JERRY PETERMAN, in his official capacity as
Mayor of the City of Graham, North Carolina;
FRANKIE MANESS, in his official capacity as
Graham City Manager; CHIP TURNER, in his
official capacity as Mayor Pro-Tem of the City
of Graham; MELODY WIGGINS, JENNIFER
TALLEY, and RICKY HALL, in their official
capacities as Graham City Council Members;
JEFFREY PRICHARD, in his official capacity
as Chief of the Graham Police Department;
TERRY S. JOHNSON, in his official capacity as
Sheriff of Alamance County; BRYAN HAGOOD,
in his official capacity as Alamance County Manager,

        *Defendants*.

Civil Action No. _____

## COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

1

## NATURE OF THE ACTION

1.     This action challenges Chapter 18, Art. VI, Sections 18-172, 18-174–181 of the City of Graham, North Carolina's Code of Ordinances (hereinafter, "the Ordinance"). The Ordinance requires any group of "two or more persons" gathering "for the purpose of protesting any matter or making known any position or thought of the group or of attracting attention thereto" and anyone at all "march[ing] . . . upon the public streets, sidewalks, parks, or other public places" to acquire a permit from the Graham police chief at least 24 hours in advance. The Ordinance gives the police chief complete discretion to limit gatherings to no more than six individuals and deny permit applications based on the chief's judgment that the gathering might cause "a public disturbance," and restricts all First Amendment-protected speech and assembly rights of minors absent discretionary permission by the police chief.

2.     The Ordinance is an unconstitutional prior restraint on First Amendment rights to free speech and assembly, violates the First Amendment's prohibition against unreasonable and content-based time, place and manner restrictions of speech in traditional public forums and violates due process because it is void for vagueness.

3.     This action also challenges Defendants' repeated denial of attempts by Plaintiffs and countless other speakers to protest in front of the Alamance County Historic Courthouse in Graham's town square (hereinafter, "Historic Courthouse"). Protesting in that location is central to Plaintiffs' message because they seek to protest the continued presence in the public square of the Confederate monument, which glorifies the legacy of

2

slavery, white supremacy, and racial oppression of African Americans in Alamance County. Plaintiffs have protested and intend to continue to protest institutionalized racism and police violence against Black individuals and communities.

4.     This action also challenges Defendant Peterman's repeated issuance, and Defendants Johnson, Maness and Prichard's enforcement via Sheriff deputies and Graham police officers of the so-called "State of Emergency" Declarations (hereinafter "orders"). Defendant Peterman issued the first such order on May 31, 2020, prohibiting people from "gathering or demonstrating on any public street, sidewalk, or public property" between the hours of 9:00p.m. and 6:00am. The most recent order issued on June 27, 2020 and completely suspended individuals' rights to free movement, assembly and speech.

5.     None of Defendant Peterman's orders were justified by any actual state of emergency or imminent threat to public health or safety. They were instead motivated by the Defendants' desire to prevent individuals and groups, including Plaintiffs, from protesting the Confederate monument, institutionalized racism and police violence against Black individuals and communities in Graham's town square.

6.     In light of ongoing and imminent irreparable harm to Plaintiffs, including the ongoing threat of criminal prosecution and civil enforcement, Plaintiffs respectfully request preliminary and permanent injunctive relief to ensure immediate cessation of enforcement of Graham's unlawful permit and protest ordinance.

3

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this case arises under the U.S. Constitution and laws of the United States; and pursuant to 28 U.S.C. § 1343 because this action seeks to redress the deprivation, under color of state law, of Plaintiffs' civil rights, and to secure equitable or other relief for the violation of those rights.

8.      This Court has jurisdiction to grant declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202, as well as Rule 57 of the Federal Rules of Civil Procedure.

9.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c). Plaintiffs regularly engage in expressive and associative activities in this District. All Plaintiffs live and/or work in this District.

## PARTIES

**Plaintiffs**

10.     Plaintiff Alamance County Branch of the National Association for the Advancement of Colored People ("NAACP") is the local affiliate of the North Carolina State Conference of the NAACP and a part of the nation's oldest civil rights organization. The NAACP is dedicated to seeking justice for all persons and the elimination of race discrimination. The NAACP has organized and participated in public demonstrations in Graham and Alamance County, is planning future protests and demonstrations at the Confederate monument in Graham in the very near future, and its members regularly

4

participate in protests and other public assemblies in Graham, Alamance County and throughout the state.

11. Plaintiff NAACP is an expressive association that seeks to promote the interests of its members and equality for all people, free from racial discrimination. NAACP engages in expression, including protest, to advance the interests of its members and equality for all people, free from racial discrimination.

12. Plaintiff Tamara O. Kersey is an adult Black female resident of Graham, North Carolina, Associate Pastor of Wayman Chapel AME in Graham, and a member of organizational Plaintiff NAACP, for which she serves as Community Coordination Committee Chairperson. Plaintiff Kersey has sought to exercise her right to protest against the Confederate monument, racialized policing and police violence in Graham, but has not done so because of Graham's permit ordinance requirements and Defendants' protest ban. As set forth further below in the Factual Allegations, Plaintiff Kersey intends to exercise her right to protest on July 4, 2020 and has also applied (but has received no response from Defendants) for a permit for a protest and prayer vigil to take place near the Confederate monument in Graham later in July.

13. Plaintiff Colleen Tenae Turner is a twenty-three-year-old Black female resident of North Carolina who has sought to organize protests in downtown Graham at the Historic Courthouse to support the Black Lives Matter movement and oppose the Confederate Monument situated there. Plaintiff Turner intends to continue her efforts to participate in such protests in Graham in the near future.

5

14.     Plaintiff Terence Colin Dodd is a white male resident of Hillsborough, North Carolina who sought to protest police brutality against Black people and communities of color and to protest the continued presence of the Confederate monument in front of the Alamance County Historic Courthouse in Graham on the morning of June 27, 2020. Plaintiff Dodd intends to continue his protesting in Graham in the near future.

15.     Plaintiff Destiny Clarke is a twenty-seven year-old white female resident of Mebane, North Carolina who has sought to demonstrate in downtown Graham at the Historic Courthouse to protest white supremacy, support the Black Lives Matter movement, and oppose the Confederate Monument situated there. She intends to continue her efforts to participate in such protests in Graham in the near future.

16.     Plaintiff Annie Simpson is a twenty-two-year-old white female resident of Concord, North Carolina who has sought to organize protests in downtown Graham at the Alamance Courthouse to protest white supremacy, support the Black Lives Matter movement, and oppose the Confederate Monument situated there. Plaintiff Simpson intends to continue her efforts to participate in such protests in Graham in the near future.

17.     Plaintiff Nerissa Rivera is a fifty-nine-year-old Latina resident of Alamance County, North Carolina who has previously demonstrated in downtown Graham near the Alamance Courthouse to support racial equality and oppose the Confederate monument outside the Historic Courthouse. She seeks to engage in large and small group demonstrations there in the near future.

6

18.     Plaintiff Adam Rose is a thirty-six-year-old white male resident of Graham North Carolina who applied for a permit to protest the statement published by the Alamance County Sheriff's Office banning demonstrations.  The City of Graham denied his permit application on June 27, 2020.  Plaintiff Rose intends to continue his efforts to participate in protests in Graham in the near future.

19.     Plaintiff Gregory B. Drumwright is a Black resident of North Carolina, Professor of Communications at High Point University, a community organizer and social justice activist, and Senior Minister of the Citadel Church in Greensboro. Plaintiff Drumwright has applied for a permit for a demonstration to protest racialized policing and police brutality against Black people and communities, and to protest the Confederate monument in Graham on July 11, 2020.  He also plans to protest those same issues in Graham near the Historic Courthouse without seeking a permit on July 4, 2020.

**Defendants**

20.     Defendant Jerry Peterman ("Defendant Peterman" or "the Mayor") is sued in his official capacity as Mayor of the City of Graham, is domiciled in the state, and is subject to the personal jurisdiction of this Court.

21.     Defendant Frankie Maness is sued in his official capacity as Graham City Manager, is domiciled in the state, and is subject to the personal jurisdiction of this Court.

22.     Defendant Chip Turner is sued in his official capacity as Mayor Pro-Tem of the City of Graham, is domiciled in the state, and is subject to the personal jurisdiction of this Court.

7

23.     Defendant Melody Wiggins is sued in her official capacity as a Graham City Council Member, is domiciled in the state, and is subject to the personal jurisdiction of this Court.

24.     Defendant Jennifer Talley is sued in her official capacity as a Graham City Council Member, is domiciled in the state, and is subject to the personal jurisdiction of this Court.

25.     Defendant Ricky Hall is sued in his official capacity as a Graham City Council Member, is domiciled in the state, and is subject to the personal jurisdiction of this Court.

26.     Defendant Jeffrey Prichard ("Defendant Prichard" or "GPD") is sued in his official capacity as Chief of the Graham Police Department, is domiciled in the state, and is subject to the personal jurisdiction of this Court.

27.     Defendant Terry S. Johnson ("Defendant Johnson" or "the Sheriff") is sued in his official capacity as Sheriff of Alamance County, is domiciled in the state, and is subject to the personal jurisdiction of this Court.

28.     Defendant Bryan Hagood is sued in his official capacity as Alamance County Manager, is domiciled in the state, and is subject to the personal jurisdiction of this Court.

## FACTUAL ALLEGATIONS

**The Confederate Monument at the Alamance Historic Courthouse in Downtown Graham, NC**

29.     The Confederate Monument outside the Historic Courthouse was erected in 1914 as a result of a coordinated statewide effort of the United Daughters of the Confederacy ("UDC") to place these monuments in public squares across the State.

30.     Founded in 1894, the UDC organized and built Confederate Monuments, cared for Confederate veterans and widows, and promoted and published textbooks for use in schools across the South.

31.     The UDC also advanced and supported a political white supremacy campaign which disenfranchised and terrorized Black people.

32.     The UDC officially recognized the Ku Klux Klan for helping to restore southern home rule and white supremacy.

33.     The UDC's objective was to vindicate and glorify the Confederacy and to promote the "Lost Cause" mythology, a false historical narrative which downplayed the harm and significance of slavery and promoted a policy of racial segregation and white supremacy.

34.     According to the inscription on the Confederate monument in Graham, it was "erected through the efforts of the Graham Chapter" of the UDC. The total cost for the monument was $2,100, plus an additional $305 for the mound and post, chain and curbing enclosure surrounding the monument. On January 5, 1914, the Alamance County Board of Commissioners appropriated $1,000 to contribute to the project.

35.     Upon information and belief, the Graham Chapter of the UDC covered the majority of the costs for the project.

9

36. The monument consists of a statue of a Civil War infantryman, wearing a brimmed, floppy slouch hat and a butternut cloth uniform, standing at parade rest with his rifle and attached bayonet at his right side. The sculpture rests upon a shaft mounted on a middle base with tiered upper and lower sections atop a stepped bottom. There are crossed Confederate battle flags on the front of the shaft.

37. In addition to the above referenced inscription attributed to the UDC, the monument contains the following inscriptions:

    (a) "To Commemorate With Grateful Love the Patriotism, Valor, and Devotion to Duty, of the Brave Soldiers of Alamance County, Our Confederate Soldiers"

    (b) "On Fame's Eternal Camping Ground, Their Silent Tents are Spread, and Glory Guards, with Solemn Round, the Bivouac of the Dead."

    (c) "Faithful Unto Death, They are Crowned with Immortal Glory."

**Opposition to the Confederate Monument at the Historic Courthouse**

38. Groups of pro-Confederate demonstrators gather in front of the Confederate Monument annually in May to celebrate Confederate Memorial Day. They are often met by citizens who oppose the Confederate monument's presence in the public square and the neo-confederate white supremacist ideology.

39. Anti-racism protesters have gathered at the Historic Courthouse in greater frequency and in greater numbers since 2015, when white supremacist Dylann Roof murdered nine Black people worshipping at the Emanuel Methodist Episcopal Church in

10

downtown Charleston, South Carolina on June 17, 2015 under the banner of the Confederate flag.

40. The attack sparked a new national discussion around Confederate monuments, and many states and municipalities began removing them.

41. However, the North Carolina General Assembly instead passed a law in 2015 preventing local governments from moving any government-owned "object of remembrance" located on public property. N.C. Gen. Stat.§100-2.1.

42. Recently the Mayor of Burlington was joined by fifty other elected officials, Plaintiff NAACP, and other community leaders in calling for the relocation of the Confederate Monument from the steps of the Historic Courthouse.

### Nationwide Protests After the Killing of George Floyd

43. On May 25, 2020, Derek Chauvin, a Minneapolis Police Department officer, knelt on the neck of George Floyd, a 46-year-old Black man, for nearly nine minutes, causing his death. Mr. Floyd died as three other officers looked on. The police killing of Mr. Floyd sparked protests across the country against police brutality in more than 2,000 cities and towns in more than 60 countries in support of the Black Lives Matter movement.

### Defendants' Weekend So-Called "State of Emergency" Orders

44. As the protests in response to Mr. Floyd's death and against police violence spread nationwide, Defendant Peterman began issuing regular so-called "State of Emergency Declarations" (hereinafter, "orders") each weekend to suppress such protests.

11

**May 31-June 1, 2020 Order**

45.    On May 31, the City of Graham posted a press release on its website announcing the Mayor's first such order, stating that it was "due to the potential for damage or injury, due to civil unrest."

46.    Neither Defendant Peterman nor the City cited any examples of threatened or actual civil unrest, damage to property or injury in its municipal city limits.

47.    In fact, there was no threatened or actual civil unrest occurring in Graham on May 31, 2020.

48.    Defendant Peterman's May 31 order included the following restrictions:

(a) "Restricted Access: It shall be unlawful to disobey any barriers, warning signs or other structures that restrict vehicular or pedestrian travel due to road closure, detours, hazards, etc."

(b) "Furthermore, this declaration denies or restricts access to areas, streets, highways or locations within the City in which that restriction or denial of access or use is reasonably necessary to promote efforts being made to overcome the emergency or to prevent further aggravation of the emergency."

49.    On May 31, the City of Graham posted a notice on its website announcing the following additional terms of the order:

(a) "A curfew of 9 p.m. with the exception of Public Safety personnel, Doctors, Nurses and such other classes of persons as may be essential to the preservation of public order and immediately necessary to serve safety, health and welfare needs of the people within the City;"

(b) "a prohibition against travel to or within the Fire Limits as prescribed in Section 6-31 of the City of Graham Code of Ordinances;"

12

(c) "a prohibition against the possession, transportation, sale, purchase, and consumption of alcoholic beverages away from one's own premises;" and

(d) "a prohibition against the use of dangerous weapons and substances unless permitted or exempted by Section 2-54(4) of the City of Graham Code of Ordinances or application General Statute."

50.　On June 1, 2020, the City of Graham posted on its official Facebook page that it was lifting the order and curfew effective immediately.

**June 4–June 9, 2020 Order**

51.　On June 4, 2020 at 9:01p.m., the City of Graham posted a press release on its Facebook page and its website announcing another order by Defendant Peterman's restricting people's movement "due to the potential for widespread or severe damage, injury, loss of life or property due to civil unrest."

52.　Neither Defendant Peterman nor the City cited any examples of threatened or actual civil unrest, damage to property or injury in its municipal city limits.

53.　In fact, there was no threatened or actual civil unrest occurring in Graham on June 4, 2020.

54.　Defendant Peterman's order stated that it would "shall remain in effect until June 9 at 6am unless it is rescinded prior."

55.　The June 4 order included restrictions and conditions identical to the May 31-June 1 order with two amendments:

(a) Extending the curfew from 9p.m. to 6a.m.

13

(b) Clarifying that "citizens traveling to or from places of employment" were

exempted from the curfew.

56.     On June 5, 2020 at 3:57 p.m., the City of Graham posted an "FAQ sheet"

about the curfew and order to its official Facebook page and website. The FAQ included

additional restrictions that were not explicitly included in either of the prior written orders:

(a) "The curfew prohibits anyone within the City of Graham, between the hours of
9 p.m. and 6 a.m., from gathering or demonstrating on any public street,
sidewalk, or public property."

(b) The curfew "prohibits travel upon any public street unless it is for the purpose
of seeking medical care, food, or other necessities for yourself or a family
member."

(c) "Violation of the curfew is punishable as a class 2 misdemeanor."

(d) "All businesses are permitted to remain open during the nightly curfew if they
choose to do so."

(e) "Unnecessary additional travel or lingering in public space is prohibited."

57.     On June 5, 2020 at 4:52p.m., the City of Graham posted a comment on its

official Facebook page, alongside a photo of the order, that "[p]reventative actions are

being taken to manage the potential for widespread damage, injury, or loss of life or

property due to civil unrest."

58.     On June 5, 2020 at 4:57 p.m., the City of Graham posted a letter from

Defendant Peterman to its official Facebook page. This letter included the following

statement regarding the State of Emergency:

> "There are several instances where a State of Emergency is declared in advance
> and disseminated with an excess of time. For events such as hurricanes or winter
> storms, we often have days to prepare based on scientific forecasts. The threat

14

of civil unrest is generally not a planned instance shared with the City. The priority of notice in these types of circumstances quickly creates the scenario of emergency management."

59.    On June 9, 2020 at 6 a.m., the City of Graham posted to its official Facebook page that the order had been rescinded.

### June 20–June 22, 2020 Order

60.    On June 20, 2020 at 8:32p.m., the City of Graham posted a press release to its Facebook page and its website announcing another order by Defendant Peterman "due to the potential for widespread or severe damage, injury, loss of life or property due to civil unrest."

61.    Neither Defendant Peterman nor the City cited any examples of threatened or actual civil unrest, damage to property, injury or loss of life within city limits.

62.    In fact, there was no threatened or actual civil unrest occurring in Graham on June 20, 2020.

63.    The June 20 order included restrictions and conditions identical to the June 4 order.

64.    On June 22, 2020 10:07a.m., the City of Graham posted to its official Facebook that the order had been rescinded.

### June 25–June 29, 2020 City of Graham "Emergency"

65.    On June 25, 2020 at 7:44p.m., the City of Graham posted a press release to its Facebook page and its website announcing another order by Defendant Peterman "due

to the potential for widespread or severe damage, injury, loss of life or property due to civil unrest."

66.     Neither Defendant Peterman nor the City cited any examples of threatened or actual civil unrest, damage to property, injury or loss of life within city limits.

67.     In fact, there was no threatened or actual civil unrest occurring in Graham on June 25, 2020.

68.     This June 25 order was identical to the June 20 order.

69.     On June 26, 2020 at 12:00 p.m., the Alamance County Sheriff posted to its official Facebook the following: "[E]ffective June 26, 2020, no permits to protest in the city of Graham, NC to include the Alamance County Courthouse have been granted, nor will be granted for the foreseeable future. Any group(s) attempting to protest without a permit, will be in violation and subject to arrest."

70.     On June 26, 2020 at 3:55 p.m., the Alamance County Sheriff official Facebook page posted the following: "The Alamance County Sheriff's Office DOES NOT participate in the permitting process for the city of Graham, NC. We are assisting the city of Graham, NC by providing them our social media platforms to help get the word out of their decision, so the public may be so informed."

71.     At the time the Sheriff declared a protest permit ban, the City of Graham had not yet done so.

16

72. On June 27, 2020 at 11:51a.m., the City of Graham posted an Amended Declaration of State of Emergency to its official Facebook page. This amended order included two changes to the original:

(a) The curfew was to begin at 8 p.m. instead of 9 p.m.

(b) "A temporary suspension of the issuance of parade and demonstration [sic] based on a clear and imminent threat to public safety."

73. This amended order differed from the Alamance Sheriff's protest ban in that it made the ban temporary rather than "for the foreseeable future."

74. The City of Graham posted a Media Release from the Graham Police Department about the Amended order which stated the following: "Graham Police Department has been receiving viable intelligence about a large group of individuals demonstrating at the historic courthouse located at the court square on 6/27/20. A peaceful protest was planned for this date, but a permit was denied. The coordinators of that event have since canceled their planned event. However, we found that another group of people were planning to come that were unrelated to the original group. The intel we received showed that the people had been involved with other protests in the state that had turned violent. In response to this potential threat we upstaffed to prepare for the crowed [sic] and requested mutual aid from multiple agencies. The mayor also amended the current state of emergency to include a temporary suspension of the issuance of parade and demonstration permits due to the clear and imminent threat to public safety."

75. On June 29, 2020 at 3:52 p.m., the City of Graham posted to its official Facebook that the order had been rescinded.

17

## The Graham City Permit Ordinance

76. Graham City Code Sec. 18-175 provides: "No parade, picket line or group demonstration is permitted on the sidewalks or streets of the city unless a permit therefor has been issued by the city; provided, however, that nothing in this section shall be construed to prevent the peaceful assembly of any group for orderly expression or communication between those assembled."

77. Graham City Code Sec. 18-172 defines a "group demonstration" as "any assembly together or concert of action between two or more persons for the purpose of protesting any matter or making known any position or thought of the group or of attracting attention thereto."

78. The ordinance defines parade as "any parade, march, ceremony, show, exhibition or procession of any kind in or upon the public streets, sidewalks, parks or other public places."

79. It defines picket line as "any persons formed together for the purpose of making known any position or promotion of said persons or on behalf of any organization."

80. Graham City Ordinance Sec. 18-178 provides for the application and issuance of permits and states: "The chief of police or, in his absence, the next highest ranking officer of the city police department is authorized to issue permits as required in this article, and in the issuance thereof shall:

(1) Require a written application therefor to be filed 24 hours in advance of such parade, picket line or group demonstration on a form prescribed by said department, and shall require the application to be signed by the person filing such application and the applicant shall therein state the proposed site, time,

18

purpose and size of such parade, picket line or group demonstration, and whether or not any minors below the age of 18 years shall participate.

(2) Refuse to issue such permit when the activity or purpose stated in the application would violate any ordinance of the city or statute of the state, or when the activity or purpose would endanger the public health or safety, or hinder or prevent the orderly movement of pedestrian or vehicular traffic on the sidewalks or streets of the city.

(3) Specify in the permit whether or not minors below the age of 18 years will be permitted to participate. The chief of police or, in his absence, the next highest ranking police officer of the city on duty shall pass upon whether or not minors below the age of 18 years shall be permitted to participate in the parade, picket line or group demonstration, and shall base his determination upon whether or not the purpose, time or place of the participation will be detrimental to or endanger the health, welfare or safety of said minors.

81.     Graham City Ordinance Sec. 18-179 sets out the "prerequisites" for issuing permits as follows: "The chief of police or other designated officer in considering the issuance of a permit shall, among other considerations provided, consider and find as a requisite for issuance that:

(1) The activity will not require excessive diversion of police from other necessary duties.

(2) The activity will not interfere with the right of property owners in the area to enjoy peaceful occupancy and use of their property.

(3) The activity can be conducted without unreasonable interference with normal vehicular or pedestrian traffic in the area, will not prevent normal police or fire protection to the public, and will not be likely to cause injury to persons or property or provoke disorderly conduct or create a public disturbance.

82.     Graham City Ordinance Sec. 18-180 provides for the contents of the permit as follows:

(a) A permit under this article may set the starting time and duration of a parade, demonstration or picket line and may set the speed of its travel; the space

19

between persons or vehicles; the portions or areas of the streets and sidewalks to be used; the length of the parade, group or line; and such other requirements as the chief of police or other designated officer may include in the permit for the control of free movement of traffic upon the streets and sidewalks, or for the health, safety and property rights of the participants and the general public. Failure to comply with such requirements, as set forth in the permit, shall be unlawful.

(b) The applicant for a permit shall specify and the permit shall designate the person in charge of the parade, group demonstration or picket line, and such person in charge shall accompany such parade, demonstration, or picket line and shall carry such permit with him at that time.

83.    Graham City Ordinance Sec. 18-181 restricts the number of participants as follows: "Any picket line or group demonstration which is located in any area subject to normally heavy pedestrian or vehicular traffic may be limited in the permit issued to a concentration of not more than six persons participating within any designated area of the street or sidewalk; provided that the officer issuing the permit may specify a larger number in the designated area where, in his judgment, conditions permit a higher concentration. The term "designated area" is defined as the entire width of said street or sidewalk "within a distance measured along its length for 100 feet."

84.    Graham City Ordinance Sec. 18-177 requires that the presence of minors be identified in the permit, and that minors are prohibited from participating in demonstrations unless the permit specifically allows it. It provides: "In any parade, picket line or group demonstration, it shall be unlawful:

(1) For any minor below the age of 18 years to participate or be allowed to participate, and any person encouraging, leading or allowing such minor to so participate, unless a permit therefor has been issued, shall be guilty of a violation of this section.

20

(2) For any person to lead, guide, participate in or in any way support or encourage such parade, picket line or group demonstration when a minor below the age of 18 years is participating therein, unless a permit for such participation by such minor has been issued.

(3) For any parent to knowingly permit any minor child of such parent under 18 years of age to participate in such parade, picket line or group demonstration unless a permit for such participation by such minor has been issued.

(4) To cause, participate in, lead or encourage any parade, picket line or group demonstration to deviate in any manner from the authority therefor specified in the permit.

## Individual Plaintiff Allegations

### NAACP

85.    Plaintiff NAACP is an expressive association that seeks to promote the interests of its members and equality for all people, free from racial discrimination. NAACP engages in expression, including protest, to advance the interests of its members and equality for all people, free from racial discrimination.

86.    The NAACP joined Alamance and Elon University leaders in a written request to the County to remove the Confederate monument from Graham's town square.

87.    NAACP has a direct and immediate interest in the issues presented in recent protests of racialized police violence and the Confederate monument in Graham, and in the rights of their members to participate, now and in the future, in such public demonstrations and protests against institutionalized racism, police violence and the Confederate monument-- rights enshrined in the laws and traditions of this state and nation, including the right to assemble with others and to freedom of speech and movement.

21

88. Those rights are trampled by Defendants through the ordinance provisions and orders that are the subject of this action, and by the unlawful "State of Emergency" orders that have been issued and will likely continue to issue absent an order from the Court.

89. In response to Defendants' actions, including the ordinance and orders, Plaintiff NAACP has been forced to divert resources to assess, plan for and educate its members about public gatherings, demonstrations and protests which it has organized or in which its members wish to participate that would trigger Defendants' unlawful conduct in Graham.

90. Such diversion of resources includes applying for a permit under the subject ordinance on June 26, 2020 for a gathering organized by faith leaders in Alamance County and the NAACP to protest the continued presence of the Confederate monument in Graham's public square.

91. The time and effort Plaintiff NAACP has expended due to Defendants' unlawful ordinance and repeated "State of Emergency" orders have reduced its capacity to plan events and programming consistent with its organizational mission. Defendants' actions are directly frustrating Plaintiff NAACP's capacity to fulfill its mission of effecting community and institutional change through peaceful public demonstrations in downtown Graham and at the Confederate monument site.

**Tamara O. Kersey**

92.     Plaintiff Tamara O. Kersey has attended vigils and rallies in the Alamance County towns of Mebane and Burlington to protest racist police brutality in the wake the killing of George Floyd, but has not protested in her hometown of Graham due to Defendants' unlawful actions. While Defendant Peterman and Johnson's orders have been in place, she has reasonably feared being arrested and charged with a misdemeanor for violating them. At all other times, she has reasonably feared being cited for not obtaining a permit from Defendant Prichard.

93.     On June 26, 2020, Plaintiff Kersey applied to Defendant Prichard for a permit as required under the ordinance for a prayer vigil on either July 18 or 25, sponsored by the NAACP and faith leaders in Alamance County, to protest police brutality against Black people and communities of color nationwide and in Alamance County, and to protest the continued presence of the Confederate monument in Graham's public square.

94.     Despite multiple requests to the Graham Police Department (GPD), Plaintiff Kersey has not received any response from Defendant Prichard or anyone else in the GPD regarding her permit application, making it difficult for her to plan for the demonstration. Based on Defendants' practice of waiting to grant or deny a permits until just before the day of the requested assembly, and the lack of any required deadline for a response in the Ordinance, Plaintiff Kersey fears that she will be unable to hold her demonstration despite having applied for the permit weeks in advance.

95.     In light of the Ordinance's vague and discretionary standards and Defendant Johnson's and GPD's prior treatment of those protesting the monument and racialized

23

police brutality, Plaintiff Kersey also fears that her permit request will be denied because of the viewpoint she seeks to express.

96.     Plaintiff Kersey has been unable to properly publicize her planned demonstration to the faith community, Plaintiff NAACP members, supporters, and the public, due to fear of subjecting participants to arrest by Defendant Johnson, his deputies or the GPD should Plaintiff Kersey, her fellow faith leaders and the NAACP proceed with the vigil without a permit.

### Tenae Turner

97.     Plaintiff Tenae Turner submitted an application for a group demonstration to the Graham City Police on June 24, 2020 at 4:33p.m.

98.     Plaintiff Turner's application requested a permit for a group of one hundred to three hundred (100-300) people to demonstrate at the Alamance County Historic Courthouse in Graham on June 27, 2020.

99.     On June 26, 2020 at 9:15p.m., Graham Assistant Chief of Police, Kristy Cole emailed Plaintiff Turner a document denying her application.

100.    Assistant Chief Cole's email stated multiple reasons for the denial of Plaintiff Turner's application including:

a.      an incomplete address;

b.      the potential for the demonstration to interfere with orderly movement of individuals and property owner's right to "enjoy peaceful occupancy and use of their property";

c.      excessive diversion of police from other necessary duties; and

24

d.    that "[r]ecent events in Court Square on 6/20/20 has [sic] already placed business owners in fear for the safety of their property, as well as, their employees. We feel that this event would further enhance the fear and concerns that they have."

101.    Assistant Chief Cole's email also stated that no protests are allowed at the Historic Courthouse.

102.    On June 27, 2020, Plaintiff Turner submitted a new application for a permit to demonstrate that she hoped would address the concerns outlined in Defendants' denial email for her June 24, 2020 application.

103.    In this new permit application, Plaintiff Turner requested a permit for a demonstration on June 28, 2020 at the Historic Courthouse from 6p.m. to 8p.m. for up to eight people.

104.    The application included Plaintiff Turner's complete address and stated that protestors would be social distancing at least 6 feet apart, wearing masks, and not yelling or chanting, although they would be holding signs.

105.    On June 27, 2020 at 7:04 p.m., Assistant Chief Cole wrote to Plaintiff Turner informing her that she would "need to seek written permission from Alamance County to be on the grounds of county property" and asked her to resubmit her application with that written permission included.

106.    Plaintiff Turner replied that demonstrators would protest on the grass at the Historic Courthouse or on the sidewalk immediately adjacent to the Historic Courthouse.

107.    Assistant Chief Cole replied that she was unable to issue a permit for group demonstration due to the Mayor's June 27, 2020 State of Emergency order.

25

108.    Plaintiff Turner then cancelled the planned demonstration out of fear that participants would be arrested if they demonstrated in Graham without a permit.

109.    Plaintiff Turner plans to continue to organize group demonstrations outside the Historic Courthouse in the near future.

**Terence Colin Dodd**

110.    Plaintiff Dodd, with his mouth and nose covered for COVID-19 transmission prevention, peacefully approached the Confederate monument in front of the Alamance County Historic Courthouse around 6:00a.m. on Saturday, June 27, 2020 holding a poster that read "Black Lives Matter."

111.    One of Defendant Johnson's deputies was in a squad car parked beside the monument at the crosswalk.

112.    As Plaintiff Dodd approached the monument with his sign, the deputy got out of the car, walked toward Plaintiff Dodd and ordered him to step back.

113.    The deputy had no mouth or nose covering to protect against COVID-19 transmission.

114.    Plaintiff Dodd asked the deputy to explain the ordinance or other legal authority that permitted him to prevent Plaintiff Dodd from demonstrating at the Confederate monument on the Historic Courthouse steps.

115.    The deputy did not answer Plaintiff Dodd, but instead called on his radio for backup.

116.    A half dozen squad cars arrived, and eight to ten Sheriff deputies.

26

117. Plaintiff felt overwhelmed and fearful, but kept saying to the deputies, "Tell me the law, tell me what law I'm breaking," and asking if he was under arrest.

118. GPD officers then arrived and told Plaintiff Dodd that he could not be on County property but could walk on the sidewalk across the street from the Confederate monument so long as he was alone, not with a group.

119. Because he did not want to get arrested, Plaintiff Dodd obeyed the officers and the deputies and walked alone on the sidewalk with his sign until close to 10:00a.m., when he left.

### Nerissa Rivera

120. On June 27, 2020 Plaintiff Nerissa Rivera was planning to go to the protest in Graham organized by Plaintiff Turner. She had seen the protest announced on Facebook.

121. Plaintiff Rivera opposes the Confederate Monument standing outside the Alamance Historic Courthouse because it represents murder, inequality, and racism. It frustrates her to see law enforcement wasting taxpayer money protecting the monument when there was real public safety work that needed to be done in the county.

122. Before she got to Graham on June 27, she learned that Plaintiff Turner had cancelled the demonstration because she could not get a permit from the City and did not want anyone to get arrested or injured.

123. Plaintiff Rivera decided to go to downtown Graham and protest alone.

27

124.    Before going out to the monument to protest, Plaintiff Rivera joined some friends at a restaurant near the Historic Courthouse.

125.    Plaintiff Rivera joined a group to walk with a friend back to her car, and they walked in pairs, six feet apart on the sidewalk together to comply with COVID-19 precautions.

126.    When they crossed the street, two Graham police officers approached Plaintiff Rivera and her friends and told them they could not protest.

127.    Members of the group responded to the officers that they were not protesting, and explained they were walking their friend to her car.

128.    Officers said they would allow them to walk to the car but would not allow them to protest. Officers instructed the group that if they started to protest, they would be ordered to leave or disperse.

129.    Plaintiff Rivera and the group entered a local business owned by a Black woman, and then exited to walk their friend to her car.

130.    Plaintiff Rivera and her group walked a second time along the path they had just taken.

131.    Officers approached again and ordered Plaintiff Rivera and her group to disperse.

132.    Across the street, there was a group of white people with Confederate flags. Members of Plaintiff Rivera's group asked the officers why the other group with Confederate flags was not ordered to leave.

28

133.    Graham police officers responded that they had not been instructed to concentrate on the area where the other group with the Confederate flags was located.

134.    Plaintiff Rivera left the scene without being able to demonstrate with her group.

135.    Plaintiff Rivera had intended to join a protest at the Historic Courthouse which was cancelled as a result of the denial of Plaintiff Turner's permit. She attempted to walk around the Historic Courthouse in protest and was threatened by police. She intends to continue her efforts to protest the presence of the Confederate monument at the Alamance Historic Courthouse.

**Destiny Clarke**

136.    Plaintiff Destiny Clarke arrived in downtown Graham on June 28, 2020 at approximately 7:00p.m.

137.    Defendant Peterman's June 27, 2020 order prohibiting group demonstrations was in effect.

138.    Plaintiff Clarke exited her car and began walking alone and silently on West Elm Street carrying a "Black Lives Matter" sign.

139.    As she turned onto the sidewalk on NW Court Square, she was stopped by a GPD officer who threatened to arrest her if she did not leave the area.

140.    The officer told Plaintiff Clarke that there is no protesting allowed and she needed to leave or be arrested.

29

141. Plaintiff Clarke replied, "I don't have to leave because it's a public place and it's before curfew."

142. The officer persisted in threatening to arrest her if she did not leave.

143. Plaintiff Clarke offered to throw away her sign and then threw it away.

144. As she was throwing away "Black Lives Matter" sign, the officer continued to threaten to arrest her if she did not leave.

145. Once she threw away her sign, the officer left.

146. During the interaction, a family passed by carrying ice cream and the officer did not interact with them or ask them to leave.

147. Plaintiff Clarke believes that she was threatened with arrest specifically because she was carrying a sign with a political message.

148. She was not permitted to walk alone on the public sidewalk in Graham, apparently because she was carrying a poster with anti-racist speech on it.

149. Plaintiff Clarke plans to continue to protest at the Alamance Historic Courthouse in the near future.

**Annie Simpson**

150. On June 29, 2020 at 3:25p.m., Plaintiff Annie Simpson called the GPD to inquire about how to apply for a permit to demonstrate at the Alamance County Historic Courthouse.

151. Assistant Chief Kristy Cole informed Plaintiff Simpson that she would have to submit written permission from the Alamance County Manager's Office along with her

30

application for demonstration permit in order to hold a permitted demonstration at the Historic Courthouse.

152.    On June 29, 2020 at 4:02p.m., Plaintiff Simpson called Defendant Hagood's office to inquire about the process of acquiring written permission to demonstrate at the Alamance County Historic Courthouse.

153.    Plaintiff Simpson informed the individual who answered the phone in Defendant Hagood's office that she was applying for a protest permit with GPD and that the protest would be on county property at the Historic Courthouse.

154.    Plaintiff Simpson asked for Defendant Hagood's email address so she could request the written permission GPD told her was needed. The person she spoke with asked her what she needed the permit for, and she answered that she was applying for a protest permit. After waiting on hold, Plaintiff Simpson was told, "I'm not sure why Graham is telling you to contact the County Manager because the county does not issue any kind of protest permits. You'll have to go through the City of Graham."

155.    Plaintiff Simpson explained again that she had been told by Assistant Chief Cole that she needed to gain written permission from the County Manager before she could even apply for a permit to demonstrate on the grass or steps outside the Alamance County Historical Courthouse.

156.    Defendant Hagood's staff person responded that no protest would be allowed on courthouse grounds.

31

157. Plaintiff Simpson asked for clarification and Defendant's staff person repeated that no protests are allowed on courthouse grounds.

158. Plaintiff Simpson again requested Defendant Hagood's email address so she could send a written request and the staff person gave it to her.

159. On June 29, 2020 at 4:08p.m., Plaintiff Simpson sent Defendant Haygood the following email requesting written permission to demonstrate on the steps and/or grass of the Alamance County Historic Courthouse:

Sent with ProtonMail Secure Email.

------- Original Message -------
On Monday, June 29, 2020 4:08 PM, Annie Simpson <asimps@protonmail.com> wrote:

> I am writing to request your written permission to hold a 4-person Black Lives Matter peaceful,
> quiet protest holding small posters at the Alamance County Historical Courthouse in Graham.
> This demonstration would take place on the sidewalk nearest the courthouse at the intersection
> of NW Court Square, NE Court Square, and N Main St. We would like to demonstrate from
> 6:30pm-7:30pm on Wednesday, June 1. During the demonstration, we will of course be social
> distancing with at least 6' between us and wearing masks. Please let me know if you have any
> questions. Also, please reply within 24 hours as Chief Kristi Cole informed me that I need to get
> your written permission before I can send in my permit request to Graham PD and Graham PD
> require 24-hours notice for permit requests.
>
> Annie Simpson

160. As of this filing, Plaintiff Simpson has yet to receive a reply to her email and is therefore unable to even begin the process of requesting a permit from Graham to demonstrate at the Alamance County Historic Courthouse.

32

**Adam Rose**

161.    Plaintiff Adam Rose became concerned about police and governmental overreaction to peaceful protests in Graham in early June 2020.

162.    On June 9, 2020, Plaintiff Rose attended the Graham City Council meeting and attempted to express his concerns. One of the Council Members stood up and walked out of the room while Plaintiff Rose was presenting his case.

163.    On June 2, 2020, Plaintiff Rose passed by the Historic Courthouse Square and was surprised to see neo-confederate demonstrators near the monument openly carrying firearms, in contravention of state law regarding public demonstrations.

164.    On June 26, 2020 Plaintiff Rose filed an application for a permit to demonstrate at Historic Courthouse Square. Plaintiff Rose indicated he planned to attend with five others on June 28 for a two-hour period.

165.    On June 27, Assistant Chief Cole informed Plaintiff Rose that his permit had been denied, and that no permits would be issued for an indefinite period of time.

166.    On June 28, after contacting Graham Police and getting their permission, Plaintiff Rose went by himself and displayed a sign across from the Historic Courthouse for approximately two hours. He was not bothered by the police during this time.

**Plaintiff Gregory Drumwright**

33

167. On July 1, 2020, Plaintiff Drumwright applied for a permit to hold a large demonstration at the Historic Courthouse square in Graham on July 11.

168. Soon after emailing the permit application to the GPD, Plaintiff Drumwright received an emailed acknowledgement of receipt of his application stating that it would be forwarded to GPD Lieutenant Flood, who would then follow up with Plaintiff Drumwright,

169. Plaintiff Drumwright later telephoned Lt. Flood, who told Plaintiff that he had seen Plaintiff's application and would get back to him about it.

170. To date, Lieutenant Flood has not responded to Plaintiff's subsequent calls or otherwise given Plaintiff any information about the status of his application.

171. Plaintiff Drumwright was concerned that Defendants will not advise him whether his permit is granted in sufficient time to be able to plan and make arrangements for the July 11 demonstration.

172. For that reason, on July 1, Plaintiff Drumwright called Graham's Assistant City Manager, Aaron Holland, concerning his permit application.

173. Mr. Holland told Plaintiff Drumwright that Defendant Johnson was not allowing any permits for protests to be issued.

174. Plaintiff Drumwright plans to go to Graham on July 4, 2020 accompanied by other community members who have been denied their civil rights, to demonstrate and protest peaceably in and around the courthouse square in Graham.

34

175.    Those community members have witnessed white people who want to keep the Confederate monument demonstrating in the same public space without any interference by any law enforcement officers.

176.    However, those who oppose the monument because it glorifies the legacy of slavery and racial oppression of African Americans in Alamance County have been dispersed from that same property by law enforcement officers.

177.    On July 4, Plaintiff Drumwright intends to protest Graham's ordinance and Defendants' violation of people's rights to protest against white supremacy, police brutality and racial oppression.

## CLAIMS FOR RELIEF

**COUNT ONE**
**VIOLATION OF FREE EXPRESSION, FREE ASSOCIATION, AND ASSEMBLY**
**RIGHTS UNDER THE FIRST AND FOURTEENTH AMENDMENTS TO THE**
**UNITED STATES CONSTITUTION**
**42 U.S.C. § 1983**
***On Behalf of All Plaintiffs Against All Defendants***

178.    The foregoing allegations are repeated and incorporated as though fully set forth herein.

179.    Plaintiffs assert a claim pursuant to 42 U.S.C. § 1983 for violation of the free expression, free association, and assembly rights protected under the First and Fourteenth Amendments to the U.S. Constitution. Plaintiff NAACP asserts this claim on behalf of itself and its members.

35

180.   In the following paragraphs, references to the First Amendment include the First Amendment as applied to the states through the Fourteenth Amendment.

181.   The ordinance impermissibly burdens protected speech, assembly, and association, including protests that oppose institutional racism, police brutality, and the continued presence of Confederate monuments in Graham.

182.   The ordinance is a content-based regulation that prohibits constitutionally protected speech meant to protest or make known "any position."

183.   The ordinance, which prohibits protests of any size anywhere in the city without 24 hours of advance notice and permission from the police chief, is not narrowly tailored to serve a compelling or substantial government interest, and fails to leave open ample alternative channels of communication.

184.   The ordinance is an unconstitutional prior restraint because it invests officers with sweeping discretion to suppress speech.

185.   Defendants' denial of attempts by Plaintiffs and countless other speakers to protest in front of the Alamance County Historic Courthouse in Graham's town square is also an unreasonable time, place, and manner restriction and unconstitutional prior restraint.

**COUNT TWO**
**VIOLATION OF DUE PROCESS RIGHTS UNDER THE FOURTEENTH**
**AMENDMENT TO THE UNITED STATES CONSTITUTION**
**42 U.S.C. § 1983**
***On Behalf of All Plaintiffs Against All Defendants***

186.    The foregoing allegations are repeated and incorporated as though fully set forth herein.

187.    Plaintiffs assert a claim pursuant to 42 U.S.C. § 1983 for violation of due process rights protected under the Fourteenth Amendments to the U.S. Constitution. Plaintiff NAACP asserts this claim on behalf of itself and its members.

188.    The ordinance is void for vagueness because it fails to provide Plaintiffs and countless other speakers with fair notice of what standards they must satisfy in order to be permitted to protest, assemble, or march anywhere in the City, and because it invites arbitrary and discriminatory enforcement.

189.    The ordinance additionally violates Plaintiffs' right to travel and freedom of movement under the Fourteenth Amendment because it is not narrowly tailored to a compelling or substantial government interest.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that the Court grant the following relief:

(a)    Temporarily restrain and preliminarily enjoin enforcement of the Ordinance;

(b)    Order Defendants to immediately notify their officers, agents, employees, and other persons in active concert or participation with them, if preliminary injunctive relief is entered;

(c)    Enter a declaratory judgment stating that the Ordinance violates Plaintiffs' rights to free speech and assembly, due process, and freedom of movement under the First and Fourteenth Amendments of the U.S. Constitution;

37

(d)   Enter a permanent injunction enjoining the enforcement of the ordinance;

(e)   Enter a declaratory judgment stating that Defendants must allow the free exercise of First Amendment rights to assembly and speech at the Historic Courthouse square and on any other public property;

(f)   Award Plaintiffs their reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and 28 U.S.C. § 1920 and as otherwise permitted by law; and

(g)   Order such other relief as this Court deems just and equitable.


Respectfully submitted this 2nd day of July 2020,

/s/ Kristi L. Graunke
  Kristi L. Graunke
  North Carolina Bar No. 51216
  kgraunke@acluofnc.org
  Daniel K. Siegel
  North Carolina Bar No. 46397
  dsiegel@acluofnc.org
  ACLU of North Carolina
  P. O. Box 28004
  Raleigh, NC  27611-8004
  Tel: 919-834-3466

Vera Eidelman
New York Bar No. 5646088
veidelman@aclu.org
Emerson Sykes
New York Bark No. 5020078
esykes@aclu.org
ACLU Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Tel: 212-549-2500

/s/ Elizabeth Haddix
  Elizabeth Haddix
  North Carolina Bar No. 25818
  ehaddix@lawyerscommittee.org
  Mark Dorosin
  North Carolina Bar No. 20935
  mdorosin@lawyerscommittee.org
  Lawyers' Committee for Civil Rights Under Law
  P.O. Box 956
  Carrboro, NC 27510
  Tel. 919-914-6106

C. Scott Holmes
Lockamy Law Firm
North Carolina State Bar No. 25569
scott.holmes@lockamylaw.com
3130 Hope Valley Road
Durham, North Carolina 27707
Tel: 919-401-5913

*Counsel for Plaintiffs*

38

## **CERTIFICATE OF SERVICE**

I certify that on July 2, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system and e-mailed true copies of this motion and attachments to the following:

Robert M. Ward, Graham City Attorney

rward42@triad.rr.com,

J. Bryan Coleman, Graham City Attorney

jbryancoleman@triad.twcbc.com

Clyde B. Albright, Alamance County Attorney

clyde.albright@alamance-nc.com

s/ Kristi Graunke
*Counsel for Plaintiffs*

39