## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF NORTH CAROLINA
### Civil Action No. 1:20-cv-00613- CCE-LPA

NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE,
Alamance County Branch; TAMARA O.
KERSEY; CARLEEN TENAE TURNER;
TERENCE COLIN DODD; DESTINY
CLARKE; NERISSA RIVERA; ADAM
ROSE; ANNIE SIMPSON;
GREGORY B. DRUMWRIGHT

        *Plaintiffs*,

    v.

JERRY PETERMAN, in his official capacity as
Mayor of the City of Graham, North Carolina;
FRANKIE MANESS, in his official capacity as
Graham City Manager; CHIP TURNER, in his
official capacity as Mayor Pro-Tem of the City
of Graham; MELODY WIGGINS, JENNIFER
TALLEY, and RICKY HALL, in their official
capacities as Graham City Council Members;
JEFFREY PRICHARD, in his official capacity
as Chief of the Graham Police Department;
TERRY S. JOHNSON, in his official capacity as
Sheriff of Alamance County; EDDIE BOSWELL,
STEVE CARTER, BILL LASHLEY, AMY SCOTT
GALEY and TIM SUTTON, in their official
capacities as Alamance County Commissioners; and
BRYAN HAGOOD, in his official capacity as
Alamance County Manager,

        *Defendants.*

**FIRST AMENDED COMPLAINT**

1

Plaintiffs file this FIRST AMENDED COMPLAINT pursuant to Federal Rule of Civil Procedure 15(a)(1).

<h2 style="text-align:center"><u>NATURE OF THE ACTION</u></h2>

1.     On July 2, 2020, Plaintiffs filed their Complaint challenging the constitutionality of Chapter 18, Art. VI, Sections 18-172 and 18-174–181 of the City of Graham, North Carolina's Code of Ordinances ("the Ordinance"), which required any group of "two or more persons" gathering "for the purpose of protesting any matter or making known any position or thought of the group or of attracting attention thereto" and anyone at all "march[ing] . . . upon the public streets, sidewalks, parks, or other public places" to acquire a permit from the Graham police chief at least 24 hours in advance. The Ordinance gave the police chief complete discretion to limit gatherings to no more than six individuals and deny permit applications based on the chief's judgment that the gathering might cause "a public disturbance," and restricted all First Amendment-protected speech and assembly rights of minors absent discretionary permission by the police chief.

2.     The July 2 Complaint alleged the Ordinance was an unconstitutional prior restraint on First Amendment rights to free speech and assembly, violated the First Amendment's prohibition against unreasonable and content-based time, place, and manner restrictions of speech in traditional public forums, and was void for vagueness under the Fourteenth Amendment's due process provision.

3.     On July 6, 2020, this Court entered a Consent Temporary Restraining Order (DE 15) restraining Defendants Jerry Peterman, Frankie Maness, Chip Turner, Melody

2

Wiggins, Jennifer Talley, Ricky Hall, and Jeffrey Prichard (collectively, "the Graham Defendants") and Terry Johnson from enforcing the Ordinance, and scheduled a hearing on Plaintiffs' Motion for a Preliminary Injunction (DE 2) for July 20, 2020.

4.      On July 14, the Graham City Council repealed Article VI of its Code of Ordinances. *See* attached Exhibit 1. (All exhibits are incorporated by reference into this Complaint). Plaintiffs withdrew their Motion for Preliminary Injunction and the parties jointly moved to cancel the July 20 hearing on that motion on July 15, 2020. DE 23. On July 16, the Court entered an order allowing Plaintiffs' motion and canceling the July 20 hearing. DE 24.

5.      Notwithstanding the Ordinance's repeal, and as pled in the original Complaint, Defendants continue to prohibit and obstruct Plaintiffs and countless other speakers from protesting in front of the Alamance County Historic Courthouse in Graham's town square ("Historic Courthouse" or "Courthouse"). Defendants have a current policy and practice of prohibiting protesters from speaking or assembling at or near the Courthouse, including on the sidewalk in front of the Courthouse and on the Courthouse steps, despite a long tradition of allowing residents to assemble there.

6.      Protesting in that location is central to Plaintiffs' message because they seek to protest the continued presence of the Confederate monument in the public square, which glorifies the legacy of slavery, white supremacy, and racial oppression of Black people in Alamance County. Plaintiffs have protested and intend to continue to protest institutionalized racism and police violence against Black individuals and communities.

3

7.    This action also challenges Defendant Peterman's repeated issuance, and Defendants Johnson, Maness, and Prichard's enforcement via Sheriff deputies and Graham police officers, of the so-called "State of Emergency" Declarations ("Emergency Orders") which have severely limited the rights of protesters in Graham over the past two months. Defendant Peterman issued the first such order on May 31, 2020, prohibiting people from "gathering or demonstrating on any public street, sidewalk, or public property" between the hours of 9:00 p.m. and 6:00 a.m. Many of these orders completely restricted the ability of people to protest in Graham during several weekends in June. The most recent Emergency Order was issued on July 10, 2020, and restricted the activities of protesters within a six-block area surrounding the Confederate Monument and Historic Courthouse.

8.    On July 12, 2020 the City of Graham posted on its website "SOE – Rescinded"; however, the text of that post reads: "Mayor Jerry Peterman has rescinded the Declaration of the State of Emergency initiating the curfew for the City of Graham (June 29, 2020)." See https://www.cityofgraham.com/soe-rescinded-july-12-2020/ (last accessed July 16, 2020).

9.    None of Defendant Peterman's orders were or are justified by any actual state of emergency or imminent threat to public health or safety. They were and are instead motivated by the Defendants' desire to prevent individuals and groups (including Plaintiffs) from protesting the Confederate monument, institutionalized racism, and police violence against Black individuals and communities in Graham's Historic Courthouse square.

4

10.     In light of ongoing and imminent irreparable harm to Plaintiffs, including the ongoing threat of criminal prosecution and civil enforcement, Plaintiffs respectfully request preliminary and permanent injunctive relief to ensure immediate cessation of Defendants' unlawful restrictions on and prohibitions of Plaintiffs' protected speech and assembly rights.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this case arises under the U.S. Constitution and laws of the United States; and pursuant to 28 U.S.C. § 1343 because this action seeks to redress the deprivation, under color of state law, of Plaintiffs' civil rights, and to secure equitable or other relief for the violation of those rights.

12.     This Court has jurisdiction to grant declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202, as well as Rule 57 of the Federal Rules of Civil Procedure.

13.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c). Plaintiffs regularly engage in expressive and associative activities in this District. All Plaintiffs live and/or work in this District.

## PARTIES

**Plaintiffs**

14.     Plaintiff Alamance County Branch of the National Association for the Advancement of Colored People ("NAACP") is the local affiliate of the North Carolina State Conference of the NAACP and a part of the nation's oldest civil rights organization.

5

The NAACP is dedicated to seeking justice for all persons and the elimination of race discrimination. The NAACP has organized and participated in public demonstrations in Graham and Alamance County, is planning future protests and demonstrations at the Confederate monument situated at the Historic Courthouse in Graham in the very near future, and its members regularly participate in protests and other public assemblies in Graham, Alamance County, and throughout the state.

15.     Plaintiff Tamara O. Kersey is an adult Black resident of Graham, North Carolina; Associate Pastor of Wayman Chapel AME in Graham; and a member of organizational Plaintiff NAACP, for which she serves as Community Coordination Committee Chairperson. Plaintiff Kersey wishes to exercise her right to protest against the Confederate monument situated at the Historic Courthouse and racialized policing and police violence, but had previously not done so because of the Ordinance, and continues not to do so because of the Emergency Orders and Defendants' other actions restricting protest at the Historic Courthouse.

16.     Plaintiff Carleen Tenae Turner is an adult Black resident of North Carolina who has sought to organize protests in downtown Graham at the Historic Courthouse to support the Black Lives Matter movement and oppose the Confederate monument situated there. Plaintiff Turner intends to continue her efforts to participate in such protests in Graham in the near future.

17.     Plaintiff Terence Colin Dodd is an adult white resident of Hillsborough, North Carolina who sought to protest police brutality against Black people and

6

communities of color and to protest the continued presence of the Confederate monument in front of the Historic Courthouse in Graham on the morning of June 27, 2020. Plaintiff Dodd intends to continue his protesting in Graham in the near future.

18.     Plaintiff Destiny Clarke is an adult white resident of Mebane, North Carolina who has sought to demonstrate in downtown Graham at the Historic Courthouse to protest white supremacy, to support the Black Lives Matter movement, and to oppose the Confederate Monument situated at the Historic Courthouse. She intends to continue her efforts to participate in such protests in Graham in the near future.

19.     Plaintiff Annie Simpson is an adult white resident of Concord, North Carolina who has sought to organize protests in downtown Graham to protest white supremacy, to support the Black Lives Matter movement, and to oppose the Confederate Monument situated at the Historic Courthouse. Plaintiff Simpson intends to continue her efforts to participate in such protests in Graham in the near future.

20.     Plaintiff Nerissa Rivera is an adult Latinx resident of Alamance County, North Carolina who has previously demonstrated in downtown Graham near the Historic Courthouse to support racial equality and oppose the Confederate monument outside the Historic Courthouse. She seeks to engage in large and small group demonstrations there in the near future.

21.     Plaintiff Adam Rose is an adult white resident of Graham, North Carolina who applied for a permit to protest Defendants' efforts to suppress protests in Graham.

The City of Graham denied his permit application on June 27, 2020. Plaintiff Rose intends to continue his efforts to participate in protests in Graham in the near future.

22. Plaintiff Gregory B. Drumwright is an adult Black resident of Guilford County, North Carolina, a Professor of Communications at High Point University, a community organizer and social justice activist, and Senior Minister of the Citadel Church in Greensboro. Plaintiff Drumwright led a demonstration to protest racialized policing and police brutality against Black people and communities, and to protest the Confederate monument in Graham on July 11, 2020. He plans to continue to protest those same issues in Graham near the Historic Courthouse.

**Defendants**

23. Defendant Jerry Peterman ("Defendant Peterman" or "the Mayor") is sued in his official capacity as Mayor of the City of Graham, is domiciled in the state, and is subject to the personal jurisdiction of this Court. Defendant Peterman has authority to convene and preside over city council meetings and must sign all city ordinances before they are officially codified. *See* GRAHAM, NC ORDINANCES Ch. 2, art. II, div. 1, §§ 2-23, 2-25. Defendant Peterman also has the authority to declare, modify, and terminate Emergency Orders. *See id.,* Ch. 2, art. II, div. 2, §§ 2-51, 2-52, 2-55(1).

24. Defendant Frankie Maness is sued in his official capacity as Graham City Manager, is domiciled in the state, and is subject to the personal jurisdiction of this Court. Defendant Maness is the executive head of the Graham City Police Department, *id*. art. IV, div. 1, §§ 2-118-119, is responsible for the supervision and administration of all city

8

departments and ensuring that the City Charter and the ordinances, resolutions, and regulations of the city council are faithfully executed. *See id.* art. IV, § 4.2.

25.     Defendant Chip Turner is sued in his official capacity as Mayor Pro-Tem of the City of Graham, is domiciled in the state, and is subject to the personal jurisdiction of this Court. In the event of a vacancy in the office of the Mayor, Defendant Turner is responsible for performing the Mayor's duties until the vacancy is filled. *See id.* art. II, § 2.4.

26.     Defendant Melody Wiggins is sued in her official capacity as a Graham City Council Member, is domiciled in the state, and is subject to the personal jurisdiction of this Court. Defendant Wiggins is responsible for creating, modifying, and repealing city ordinances and has authority to vote to terminate states of emergency declared by the Mayor. *See id.* Ch. 2, art. II, div. 2, §2-55.

27.     Defendant Jennifer Talley is sued in her official capacity as a Graham City Council Member, is domiciled in the state, and is subject to the personal jurisdiction of this Court. Defendant Talley is responsible for creating, modifying, and repealing city ordinances and has authority to vote to terminate states of emergency declared by the Mayor. *See id*.

28.     Defendant Ricky Hall is sued in his official capacity as a Graham City Council Member, is domiciled in the state, and is subject to the personal jurisdiction of this Court. Defendant Hall is responsible for creating, modifying, and repealing city ordinances has authority to vote to terminate states of emergency declared by the Mayor. *See id*.

9

29.     Defendant Jeffrey Prichard ("Defendant Prichard") is sued in his official capacity as Chief of the Graham Police Department (GPD), is domiciled in the state, and is subject to the personal jurisdiction of this Court. Defendant Prichard has charge of the GPD and as such is authorized to assign duties to GPD officers and is responsible for seeing that GPD officers faithfully perform their duties. *See id.* Ch. 2, art. IV, div. 1, § 2-120.

30.     Defendant Terry S. Johnson ("Defendant Johnson" or "the Sheriff") is sued in his official capacity as Sheriff of Alamance County, is domiciled in the state, and is subject to the personal jurisdiction of this Court. Defendant Johnson is the chief law enforcement officer of Alamance County, and as such has authority to assign duties to sheriff's deputies and enforce local ordinances in effect throughout the county. *See* N.C. Gen. Stat. § 162-1 *et seq.*

31.     Defendant Eddie Boswell is sued in his official capacity as Alamance County Commissioner, is domiciled in the state, is subject to the personal jurisdiction of this Court, and along with the rest of the Board of County Commissioners, supervises the maintenance, repair, and use of all county property and issues orders and adopts by ordinance or resolution regulations concerning the use of county property pursuant to N.C. Gen. Stat. § 153A-169.

32.     Defendant Steve Carter is sued in his official capacity as Alamance County Commissioner, is domiciled in the state, is subject to the personal jurisdiction of this Court, and along with the rest of the Board of County Commissioners, supervises the maintenance, repair, and use of all county property and issues orders and adopts by ordinance or

10

resolution regulations concerning the use of county property pursuant to N.C. Gen. Stat. § 153A-169.

33.     Defendant Bill Lashley is sued in his official capacity as Alamance County Commissioner, is domiciled in the state, is subject to the personal jurisdiction of this Court, and along with the rest of the Board of County Commissioners, supervises the maintenance, repair, and use of all county property and issues orders and adopts by ordinance or resolution regulations concerning the use of county property pursuant to N.C. Gen. Stat. § 153A-169.

34.     Defendant Amy Scott Galey is sued in her official capacity as Alamance County Commissioner, is domiciled in the state, is subject to the personal jurisdiction of this Court, and along with the rest of the Board of County Commissioners, supervises the maintenance, repair, and use of all county property and issues orders and adopts by ordinance or resolution regulations concerning the use of county property pursuant to N.C. Gen. Stat. § 153A-169.

35.     Defendant Tim Sutton is sued in his official capacity as Alamance County Commissioner, is domiciled in the state, is subject to the personal jurisdiction of this Court, and along with the rest of the Board of County Commissioners, supervises the maintenance, repair, and use of all county property and issues orders and adopts by ordinance or resolution regulations concerning the use of county property pursuant to N.C. Gen. Stat. § 153A-169.

11

36.     Defendant Bryan Hagood is sued in his official capacity as Alamance County Manager, is domiciled in the state, and is subject to the personal jurisdiction of this Court. Hagood is the chief administrator of Alamance County and as such is responsible for "see[ing] that the orders, ordinances, resolutions, and regulations of the board of commissioners are faithfully executed within the county." N.C. Gen. Stat. § 153A-82 (4).

## FACTUAL ALLEGATIONS

### The Confederate Monument at the Alamance Historic Courthouse in Downtown Graham, NC

37.     The Confederate monument outside the Historic Courthouse was erected in 1914 as a result of a coordinated statewide effort of the United Daughters of the Confederacy ("UDC") to place Confederate monuments in public squares across the State.

38.     Founded in 1894, the UDC raised funds for Confederate monuments, supported Confederate veterans and widows, and promoted and published textbooks for use in schools across the South.

39.     The UDC also advanced and supported a political white supremacy campaign which disenfranchised and terrorized Black people.

40.     The UDC officially recognized the Ku Klux Klan for its role in helping to restore southern home rule and advance white supremacy.

41.     The UDC's objective was to vindicate and glorify the Confederacy and to promote the "Lost Cause" mythology, a false historical narrative which downplayed the harm and significance of slavery and promoted policies of racial segregation and white supremacy.

12

42.    According to the inscription on the Confederate monument in Graham, it was "erected through the efforts of the Graham Chapter" of the UDC. The total cost for the monument was $2,100, plus an additional $305 for the mound, post, chain, and curbing enclosure surrounding the monument. On January 5, 1914, the Alamance County Board of Commissioners appropriated $1,000 to contribute to the project.

43.    Upon information and belief, the Graham Chapter of the UDC covered the majority of the costs for the project.

44.    Confederate veteran Jacob A. Long—who founded Alamance County's branch of the Ku Klux Klan and participated in the 1870 lynching of Wyatt Outlaw, a prominent Black councilman in Graham, in the courthouse square where the monument stands today—spoke at the May 1914 dedication of the monument. Long told those attending that they shared "a common interest: to recall the achievements of the great and good of our own race and blood."

45.    The monument consists of a statue of a Confederate soldier. There are crossed Confederate battle flags on the front of the shaft. In addition to the above-referenced inscription attributed to the UDC, the monument contains the following inscriptions:

   (a) "To Commemorate With Grateful Love the Patriotism, Valor, and Devotion to Duty, of the Brave Soldiers of Alamance County, Our Confederate Soldiers"

13

(b) "On Fame's Eternal Camping Ground, Their Silent Tents are Spread, and Glory Guards, with Solemn Round, the Bivouac of the Dead."

(c) "Faithful Unto Death, They are Crowned with Immortal Glory."

**Opposition to the Confederate Monument at the Historic Courthouse**

46.     Groups of pro-Confederate demonstrators gather in front of the Confederate monument annually in May to celebrate Confederate Memorial Day. They are often met by individuals who oppose the Confederate monument's presence in the Historic Courthouse square and the neo-confederate white supremacist ideology.

47.     Anti-racism protesters have gathered at the Historic Courthouse in greater frequency and in greater numbers since 2015, after white supremacist Dylann Roof, under the banner of the Confederate flag, murdered nine Black people worshipping at the Emanuel Methodist Episcopal Church in downtown Charleston, South Carolina on June 17, 2015.

48.     The murders sparked a new national discussion around Confederate monuments, and many states and municipalities began removing them.

49.     However, the North Carolina General Assembly instead passed a law in 2015 preventing local governments from moving any government-owned "object of remembrance" located on public property. N.C. Gen. Stat. § 100-2.1.

50.     Recently, the Mayor of Burlington, fifty other elected officials, Plaintiff NAACP, and other community leaders called for the relocation of the Confederate

14

monument from the Historic Courthouse grounds because of the risk it poses to public safety and because of its white supremacist message.

## Nationwide Protests After the Killing of George Floyd

51.     On May 25, 2020, Derek Chauvin, a Minneapolis Police Department officer, knelt on the neck of George Floyd, a 46-year-old Black man, for nearly nine minutes, killing him. Mr. Floyd died as three other officers looked on. The police killing of Mr. Floyd sparked protests in more than 2,000 cities and towns and over 60 countries in support of the Black Lives Matter movement.

## Defendants' Weekend "State of Emergency" Orders

52.     As the protests in response to Mr. Floyd's death and against police violence spread nationwide, Defendant Peterman began regularly issuing "State of Emergency Declarations" ("Emergency Orders") to suppress such protests.

May 31-June 1, 2020 Emergency Order

53.     On May 31, Defendant Peterman issued the first such Emergency Order, which was publicized via a press release on the City's website, stating that it was "due to the potential for damage or injury, due to civil unrest." *See* Exhibit 2, May 31 Emergency Order.

54.     Defendant Peterman did not cite any examples of threatened or actual civil unrest, damage to property or injury in its municipal city limits. *Id*.

55.     In fact, there was no threatened or actual civil unrest occurring in Graham on May 31, 2020.

15

56.    Defendant Peterman's May 31 order included the following restrictions:

(a) Restricted Access: It shall be unlawful to disobey any barriers, warning signs or other structures that restrict vehicular or pedestrian travel due to road closure, detours, hazards, etc.
(b) Furthermore, this declaration denies or restricts access to areas, streets, highways or locations within the City in which that restriction or denial of access or use is reasonably necessary to promote efforts being made to overcome the emergency or to prevent further aggravation of the emergency.

*Id.*

57.    On May 31, the Mayor amended the order to include the following additional terms, publicized by the City of Graham in a notice on its website:

(a) A curfew of 9 p.m. with the exception of Public Safety personnel, Doctors, Nurses and such other classes of persons as may be essential to the preservation of public order and immediately necessary to serve safety, health and welfare needs of the people within the City;
(b) a prohibition against travel to or within the Fire Limits as prescribed in Section 6-31 of the City of Graham Code of Ordinances;
(c) a prohibition against the possession, transportation, sale, purchase, and consumption of alcoholic beverages away from one's own premises;
(d) a prohibition against the use of dangerous weapons and substances unless permitted or exempted by Section 2-54(4) of the City of Graham Code of Ordinances or application General Statute.

*See* Exhibit 3, May 31 Amended Emergency Order.

58.    On June 1, 2020, the Mayor lifted the order and curfew effective immediately, as announced by the City of Graham on its website, https://www.cityofgraham.com/.

June 4–June 9, 2020 Emergency Order

59.    On June 4, 2020 at 9:01 p.m., the City of Graham posted a press release on its website announcing another order by Defendant Peterman restricting people's

16

movement "due to the potential for widespread or severe damage, injury, loss of life or property due to civil unrest." *See* Exhibit 4, June 4 Emergency Order.

60.     Neither Defendant Peterman nor the City cited any examples of threatened or actual civil unrest, damage to property or injury within the municipal city limits. *Id*.

61.     In fact, there was no threatened or actual civil unrest occurring in Graham on June 4, 2020.

62.     Defendant Peterman's order stated that it would "remain in effect until June 9 at 6 a.m. unless it is rescinded prior." *Id*.

63.     The June 4 Emergency Order included restrictions and conditions identical to the amended May 31-June 1 Amended Emergency Order with two amendments:

(a) Extending the curfew from 9 p.m. to 6 a.m. *Id*.

(b) Clarifying that "citizens traveling to or from places of employment" were exempted from the curfew. *Id*.

64.     On June 5, 2020, the City of Graham posted an "FAQ sheet" about the curfew and order on its website. *See* Exhibit 5, June 5 FAQ for June 4 Emergency Order. The FAQ included additional restrictions that were not explicitly included in the written order:

(a) The curfew prohibits anyone within the City of Graham, between the hours of 9 p.m. and 6 a.m., from gathering or demonstrating on any public street, sidewalk, or public property.
(b) It also prohibits travel upon any public street unless it is for the purpose of seeking medical care, food, or other necessities for yourself or a family member.
(c) Violation of the curfew is punishable as a class 2 misdemeanor.
(d) All businesses are permitted to remain open during the nightly curfew if they choose to do so.
(e) Unnecessary additional travel or lingering in public space is prohibited.

17

*Id.*

65.     On June 5, 2020 at 4:52 p.m., the City of Graham posted a comment on its official Facebook page, alongside a photo of the order, that "[p]reventative actions are being taken to manage the potential for widespread damage, injury, or loss of life or property due to civil unrest." *See* Exhibit 6, June 5 Facebook Comment.

66.     On June 5, 2020, the City of Graham posted a letter from Defendant Peterman to its website. *See* Exhibit 7, Letter from Peterman. This letter included the following statement regarding the State of Emergency:

> There are several instances where a State of Emergency is declared in advance and disseminated with an excess of time. For events such as hurricanes or winter storms, we often have days to prepare based on scientific forecasts. The threat of civil unrest is generally not a planned instance shared with the City. The priority of notice in these types of circumstances quickly creates the scenario of emergency management.

*Id.*

67.     On June 9, 2020, the City of Graham posted to its website that the order had been rescinded. *See* Exhibit 8, June 9 Rescinded Order.

June 20–June 22, 2020 Emergency Order

68.     On June 20, 2020, the City of Graham posted a press release on its website announcing another order by Defendant Peterman "due to the potential for widespread or severe damage, injury, loss of life or property due to civil unrest." *See* Exhibit 9, June 20 Emergency Order.

18

69.     Neither Defendant Peterman nor the City cited any examples of threatened or actual civil unrest, damage to property, injury or loss of life within city limits. *Id*.

70.     In fact, there was no threatened or actual civil unrest occurring in Graham on June 20, 2020.

71.     The June 20 order included the following restrictions and conditions:

a. A curfew of 9:00pm with the exception of police officers, firefighters, doctors, nurses and such other classes of persons as may be essential to the preservation of public order and immediately necessary to serve the safety, health and welfare needs of the people within the City and citizens traveling to or from places of employment;

b. A prohibition against the use of dangerous weapons and substances unless permitted or exempted by Section 2-54(4) of the City of Graham Code of Ordinances or applicable General Statute.

*Id.*

72.     On June 22, 2020, the City of Graham posted to its website that the order had been rescinded. *See* Exhibit 10, June 20 Rescinded Order.

June 25–June 29, 2020 Emergency Order

73.     On June 25, 2020, the City of Graham posted a press release on its website announcing another order by Defendant Peterman "due to the potential for widespread or severe damage, injury, loss of life or property due to civil unrest." *See* Exhibit 11, June 25 Emergency Order.

74.     Neither Defendant Peterman nor the City cited any examples of threatened or actual civil unrest, damage to property, injury or loss of life within city limits. *Id*.

75.     In fact, there was no threatened or actual civil unrest occurring in Graham on June 25, 2020.

76.     This June 25 order was identical to the June 20 order. *Id.*

77.     On June 26, 2020 at 12:00 p.m., the Alamance County Sheriff posted on his official Facebook page the following: "[E]ffective June 26, 2020, no permits to protest in the city of Graham, NC to include the Alamance County Courthouse have been granted, nor will be granted for the foreseeable future. Any group(s) attempting to protest without a permit, will be in violation and subject to arrest." *See* Exhibit 12, June 26 Sheriff Protest Statement.

78.     On June 26, 2020 at 3:55 p.m., the Alamance County Sheriff posted the following on his official Facebook page: "The Alamance County Sheriff's Office DOES NOT participate in the permitting process for the city of Graham, NC. We are assisting the city of Graham, NC by providing them our social media platforms to help get the word out of their decision, so the public may be so informed." *See* Exhibit 13, June 26 Sheriff Second Statement.

79.     At the time the Sheriff declared a protest permit ban, the City of Graham had not yet done so.

80.     On June 27, 2020, the City of Graham posted an Amended Declaration of State of Emergency on its website. *See* Exhibit 14, June 27 Amended Order. This amended order included two changes to the original:

(a) The curfew was to begin at 8 p.m. instead of 9 p.m. *Id.*

20

(b) "A temporary suspension of the issuance of parade and demonstration [sic] based on a clear and imminent threat to public safety." *Id.*

81.     This amended order differed from the Alamance Sheriff's protest ban in that it made the ban "temporary" rather than "for the foreseeable future." *Id.*

82.     The City of Graham posted a Media Release from the Graham Police Department about the Amended order which stated the following:

> Graham Police Department has been receiving viable intelligence about a large group of individuals demonstrating at the historic courthouse located at the court square on June 27, 2020. A peaceful protest was planned for this date, but a permit was denied. The coordinators of that event have since canceled their planned event. However, we found that another group of people were planning to come that were unrelated to the original group. The intel we received showed that the people had been involved with other protests in the state that had turned violent. In response to this potential threat we upstaffed to prepare for the crowed [sic] and requested mutual aid from multiple agencies. The mayor also amended the current state of emergency to include a temporary suspension of the issuance of parade and demonstration permits due to the clear and imminent threat to public safety.

*See* Exhibit 15, June 27 Police Statement.

83.     On June 29, 2020 at 3:52 p.m., the City of Graham posted on its official Facebook page that the order had been rescinded.

July 10, 2020 Emergency Order

84.     On July 10, 2020, Defendant Peterman issued another "Declaration of State of Emergency" covering the below area outlined in red[1]:

––––––––––––––––––––

[1] Image copied from https://www.cityofgraham.com/declaration-of-a-state-of-emergency-by-the-mayor-of-the-city-of-graham-2/.



85. The July 10 order made it "unlawful to disobey any barriers, warning signs or other structures that restrict vehicular or pedestrian travel due to road closure, detours and/ or hazardous conditions," and "to use dangerous weapons and substances as those terms are defined in N.C.G.S. 14-288.1 unless permitted or exempted by Section 2- 54(4) of the City of Graham Code of Ordinances or applicable General Statute." *See* Exhibit 16, July 10 Emergency Order.

86. The July 10 order has not been rescinded.

22

## The Historic Courthouse as a Site of Protest

87.     The Historic Courthouse is located in the middle of the rotary in Graham which connects Main and Elm Streets. The road circling the Historic Courthouse is called Court Square.

88.     A sidewalk encircles the Courthouse, with steps going into the Courthouse and grassy areas on all four sides.  Pedestrians use the sidewalk to go to the Courthouse, and also to cross through the square on their way elsewhere.

89.     The north and south entrance steps are wider than the east and west sides, and a row of stately columns line the north entrance.

90.     The Confederate monument is positioned in front of the north entrance, and is accessed by a reddish brick-face crosswalk from N Main St., which runs alongside the west side of the monument to the north entrance of the Historic Courthouse.

91.     Similar reddish brick crosswalks lead from West and East Elm Street across the Court Square rotary to the east and west entrances, and from S Main to the south entrance.

92.     The Historic Courthouse has long served as a traditional public forum, including the steps on the north side, where people gather to make speeches on matters of public concern.

93.     For example, large numbers of people supporting Confederate symbols gathered in a protest on the courthouse steps and area around the Confederate Monument

23

on July 18, 2015. People supporting Confederate symbols also gathered on the courthouse steps and area around the Confederate Monument to express themselves on May 20, 2017.

**Defendants' Prohibitions on Protest at or Near the Courthouse**

94.    Defendants have a policy or practice of selectively prohibiting protesters from being on the steps of, or the sidewalk surrounding, the Alamance County Historic Courthouse.

95.    Defendants Boswell, Carter, Lashley, Galey and Sutton (hereinafter, "the Board of Commissioners") supervise the use of all county property, including the Historic Courthouse grounds, through the County Manager, Defendant Hagood. Plaintiff Simpson was told by an Alamance County civilian official that no protests of any kind are allowed "on courthouse grounds." DE 2 #8, Affidavit of Annie Simpson ¶ 8. Alamance Sheriff deputies and Graham police prohibited Plaintiff Dodd from being on the Courthouse grounds or near the monument. DE 2 #4, Affidavit of Terence Colin Dodd ¶¶ 5-11.

96.    Since the nationwide protests began in reaction to the police killing of George Floyd on May 26, 2020, Defendant Johnson, either on his own or at the direction of Defendant Hagood or the Board of Commissioners, has surrounded the Confederate monument and at times, the Historic Courthouse, with physical barriers, prohibiting protest by anti-racists and people opposing the monument on the sidewalk and steps of the Historic Courthouse.

97.    Since the nationwide protests began in reaction to the police killing of George Floyd on May 26, 2020, Graham Defendants have misused their Emergency

24

Powers to preemptively prohibit otherwise peaceful protest by anti-racist demonstrators in the downtown area.

98. Alamance Sheriff personnel also blocked access to the Historic Courthouse grounds on June 9, 2020 using their vehicles.

99. Alamance Sheriff personnel also blocked access to the Historic Courthouse grounds on June 27, 2020.

100. As shown in the following two photos, Alamance Sheriff personnel and Graham police blocked access to the Historic Courthouse grounds on July 11, 2020:





101.    Defendants blocked access to the Historic Courthouse grounds again on July 12, 2020.

102.    Alamance County Sheriff deputies and Graham police officers have ordered individuals, including Plaintiffs Dodd and Simpson, off of the sidewalks of the Historic Courthouse and prohibited them from standing on its steps.

103.    Defendants have a history of allowing protesters who want to keep the Confederate monument to demonstrate in the Historic Courthouse square and on the north steps at the front of the courthouse without any interference by any law enforcement officers.

Case 1:20-cv-00613-CCE-LPA   Document 27   Filed 07/17/20   Page 26 of 46

104.  On July 18, 2015 and May 20, 2017, public demonstrations in support of the Confederacy and Graham's Confederate Monument were held on the front steps of the Historic Courthouse.

105.  At those demonstrations, neo-confederate supporters were allowed on the steps and in front of the courthouse, while Defendants employed an extensive police presence to defend them from possible counter-protesters.

106.  However, those who oppose the monument because it glorifies the legacy of slavery and racial oppression of Black people in Alamance County are now prohibited from protesting on the steps of the Courthouse and area around the Confederate Monument.

### Individual Plaintiff Allegations

107.  Plaintiff NAACP is an expressive association that seeks to promote the interests of its members and equality for all people, free from racial discrimination. NAACP engages in expression, including protest, to advance the interests of its members and equality for all people, free from racial discrimination.

108.  The NAACP joined Alamance County and Elon University leaders in a written request to the County to remove the Confederate monument from Graham's Historic Courthouse square.

109.  The NAACP has a direct and immediate interest in the issues presented in recent protests of racialized police violence and the Confederate monument in Graham, and in the rights of its members to participate, now and in the future, in such public demonstrations and protests against institutionalized racism, police violence, and the

27

Confederate monument—rights enshrined in the laws and traditions of this State and Nation, including the right to assemble with others and to freedom of speech and movement.

110.　Those rights are trampled by Defendants through the orders and prohibition on access to Graham's Historic Courthouse and courthouse square that are the subject of this action.

111.　In response to Defendants' actions, Plaintiff NAACP has been forced to divert resources to assess, plan for, and educate its members about public gatherings, demonstrations, and protests which it has organized or in which its members wish to participate in Graham.

112.　The time and effort Plaintiff NAACP has expended due to Defendants' now-repealed Ordinance, repeated "State of Emergency" orders, and prohibition on access to the Historic Courthouse grounds has reduced its capacity to plan events and programming consistent with its organizational mission. Defendants' actions are directly inhibiting Plaintiff NAACP's capacity to fulfill its mission of effecting community and institutional change through peaceful public demonstrations in downtown Graham and at the Confederate monument site.

**Tamara O. Kersey**

113.　Plaintiff Tamara O. Kersey has attended vigils and rallies in the Alamance County towns of Mebane and Burlington to protest racist police brutality in the wake the killing of George Floyd, but has not yet protested in her hometown of Graham due to

Defendants' unlawful actions. When Graham's (now-repealed) Ordinance was in place, and now with Defendants' Johnson's and Prichard's orders and practice of prohibiting anti-racist demonstrators from accessing the Historic Courthouse grounds still in place, Plaintiff Kersey has reasonably feared being arrested and charged with a misdemeanor for violating them.

114.    On June 26, 2020, Plaintiff Kersey applied to Defendant Prichard for a permit as was required under the now-repealed Ordinance, for a prayer vigil on July 18 or 25, sponsored by the NAACP and faith leaders in Alamance County to protest police brutality against Black people and communities of color nationwide and in Alamance County, and to protest the continued presence of the Confederate monument in Graham's public square.

115.    Plaintiff Kersey received a response from Graham Police Lieutenant Flood on July 3 that the City was open to working with Plaintiff on either date. Plaintiff Kersey has reserved July 25 for the prayer vigil and demonstration.

116.    Plaintiff Kersey wishes to exercise her First Amendment freedoms to hold her vigil and demonstration on the Historic Courthouse grounds near the monument. But she reasonably expects that, as they did at the March for Justice and Community on July 11, 2020, Defendant Johnson and/or the Board of Commissioners and Defendant Hagood will prohibit social justice demonstrators from accessing the Historic Courthouse grounds or being anywhere near the Confederate monument, and will arrest any such demonstrator who goes near that public property.

29

**Tenae Turner**

117.    Plaintiff Tenae Turner sought to organize a protest of one hundred to three hundred people at the Historic Courthouse in Graham that she had scheduled for June 27, 2020.

118.    Plaintiff Turner submitted a permit application for the protest and gathering pursuant to the then-applicable Ordinance for a group demonstration to the Graham City Police on June 24, 2020 at 4:33 p.m.

119.    On June 26, 2020 at 9:15 p.m., Graham Assistant Chief of Police Kristy Cole emailed Plaintiff Turner a document denying her application.

120.    Assistant Chief Cole's email stated multiple reasons for the denial of Plaintiff Turner's application including:

a.    an incomplete address;

b.    the potential for the demonstration to interfere with orderly movement of individuals and property owner's right to "enjoy peaceful occupancy and use of their property";

c.    excessive diversion of police from other necessary duties; and

d.    that "[r]ecent events in Court Square on 6/20/20 has [sic] already placed business owners in fear for the safety of their property, as well as, their employees. We feel that this event would further enhance the fear and concerns that they have."

121.    Assistant Chief Cole's email also stated that no protests are allowed at the Historic Courthouse.

30

122.    On June 27, 2020, Plaintiff Turner submitted a new application for a permit to demonstrate that she hoped would address the concerns outlined in Defendants' denial email for her June 24, 2020 application.

123.    In this new permit application, Plaintiff Turner requested a permit for a demonstration on June 28, 2020 at the Historic Courthouse from 6 p.m. to 8 p.m. for up to eight people.

124.    The application included Plaintiff Turner's complete address and stated that protesters would be social distancing at least six feet apart, wearing masks, and not yelling or chanting, although they would be holding signs.

125.    On June 27, 2020 at 7:04 p.m., Assistant Chief Cole wrote to Plaintiff Turner informing her that she would "need to seek written permission from Alamance County to be on the grounds of county property" and asked her to resubmit her application with that written permission included.

126.    Plaintiff Turner replied that demonstrators would protest on the grass at the Historic Courthouse or on the sidewalk immediately adjacent to the Historic Courthouse.

127.    Assistant Chief Cole replied that she was unable to issue a permit for group demonstration due to the Mayor's June 27, 2020 State of Emergency order.

128.    Plaintiff Turner then cancelled the planned demonstration out of fear that participants would be arrested or fined if they demonstrated in Graham without a permit.

129.    Plaintiff Turner plans to continue to organize group demonstrations outside the Historic Courthouse in the near future.

## Terence Colin Dodd

130.     Plaintiff Dodd, with his mouth and nose covered for COVID-19 transmission prevention, peacefully approached the Confederate monument in front of the Alamance County Historic Courthouse around 6:00 a.m. on Saturday, June 27, 2020 holding a poster that read "Black Lives Matter."

131.     Plaintiff Dodd intended to demonstrate with his sign at the areas marked with red "Xs" in the photos below:



32



132.    One of Defendant Johnson's deputies was in a squad car parked beside the monument at the crosswalk (see lower right red "X" in street view Google photo above and top red "X" in aerial Google map photo above).

133.    As Plaintiff Dodd approached the monument with his sign, the deputy got out of the car, walked toward Plaintiff Dodd and ordered him to step back.

134.    The deputy had no mouth or nose covering to protect against COVID-19 transmission.

33

135.   Plaintiff Dodd asked the deputy to explain the ordinance or other legal authority that allowed the deputy to prevent Plaintiff Dodd from demonstrating at the Confederate monument and on the Historic Courthouse steps.

136.   The deputy did not answer Plaintiff Dodd, but instead called on his radio for backup.

137.   A half dozen squad cars arrived, and eight to ten Sheriff deputies.

138.   Plaintiff Dodd felt overwhelmed and fearful, but kept saying to the deputies, "Tell me the law, tell me what law I'm breaking," and asking if he was under arrest.

139.   GPD officers then arrived and told Plaintiff Dodd that he could not be on County property but could walk on the city sidewalks on the other side of Court Square so long as he was alone, not with a group.

140.   Because he did not want to get arrested, Plaintiff Dodd obeyed the officers and the deputies and walked alone on the city sidewalks with his sign until close to 10:00 a.m., when he left.

**Nerissa Rivera**

141.   On June 27, 2020 Plaintiff Nerissa Rivera was planning to go to the protest in Graham organized by Plaintiff Turner. She had seen the protest announced on Facebook.

142.   Plaintiff Rivera opposes the Confederate monument standing outside the Historic Courthouse because it represents murder, inequality, and racism. It frustrates her to see law enforcement wasting taxpayer money protecting the monument when there is real public safety work that needs to be done in the county.

34

143.   Before she got to Graham on June 27, she learned that Plaintiff Turner had cancelled the demonstration because she could not get a permit from the City and did not want anyone to get arrested or injured.

144.   Plaintiff Rivera decided to go to downtown Graham and protest alone.

145.   Before going out to the monument to protest, Plaintiff Rivera joined some friends at a restaurant near the Historic Courthouse.

146.   Plaintiff Rivera joined a racially diverse group of about ten people, some of whom were wearing Black Lives Matter shirts, to walk one member of the group back to her car. They walked in pairs, six feet apart on the sidewalk together to comply with COVID-19 precautions.

147.   Plaintiff Rivera and the group walked down the east side of N. Main Street, crossing Main Street at a point in between the Harden Street intersection and the Graham Cinema. As they walked on the sidewalk down N Main St and towards the Historic Courthouse, on the block between E Harden St and N Court Square, they were stopped by Graham police who told them they could not protest.

148.   Members of the group responded to the officers that they were not protesting, and explained they were walking their friend to her car.

149.   Officers said they would allow them to walk to the car but would not allow them to protest. Officers instructed the group that if they started to protest, they would be ordered to leave or disperse. Plaintiff Rivera's group walked south down North Main Street and turned left onto NE Court Square. They saw white people with Confederate flags

35

congregating at Sesquicentennial Park (across the street from the courthouse on NW Court Square at the intersection of N Main St and W Elm St).

150.    Graham police stopped Plaintiff Rivera and her group a little later at NE Court Square, across from N Main St. Plaintiff Rivera and others in her groups asked the officers why the group with the Confederate flags was not being ordered to leave. The officers responded that they had not been instructed to concentrate on the area where the other group with the Confederate flags was located. Plaintiff Rivera left Graham without being able to demonstrate with her group.

151.    Plaintiff Rivera had intended to join a protest at the Historic Courthouse which was cancelled as a result of the denial of Plaintiff Turner's permit. She attempted to walk around the Historic Courthouse in protest and was threatened by police. She intends to continue her efforts to protest the presence of the Confederate monument at the Historic Courthouse.

### Destiny Clarke

152.    Plaintiff Destiny Clarke arrived in downtown Graham on June 28, 2020 at approximately 7:00 p.m.

153.    Defendant Johnson's June 26 Facebook post (referenced in above paragraph 77) and Defendant Peterman's June 27, 2020 order prohibiting protests were in effect.

154.    Plaintiff Clarke exited her car and began walking alone and silently on West Elm Street carrying a "Black Lives Matter" sign.

36

155.    As she turned onto the sidewalk on NW Court Square, she was stopped by a GPD officer who threatened to arrest her if she did not leave the area.

156.    The officer told Plaintiff Clarke that there is no protesting allowed and she needed to leave or be arrested.

157.    Plaintiff Clarke replied, "I don't have to leave because it's a public place and it's before curfew."

158.    The officer persisted in threatening to arrest her if she did not leave.

159.    Plaintiff Clarke offered to throw away her sign and then threw it away.

160.     As she was throwing away "Black Lives Matter" sign, the officer continued to threaten to arrest her if she did not leave.

161.    Once she threw away her sign, the officer left.

162.    During the interaction, a family passed by carrying ice cream and the officer did not interact with them or ask them to leave.

163.    Plaintiff Clarke believes that she was threatened with arrest specifically because she was carrying a sign with a political message.

164.    She was not permitted to walk alone on the public sidewalk in Graham, apparently because she was carrying a poster with anti-racist speech on it.

165.    Plaintiff Clarke plans to continue to protest at the Alamance Historic Courthouse in the near future.

37

**Annie Simpson**

166.    On June 29, 2020 at 3:25 p.m., Plaintiff Annie Simpson called the GPD to inquire about how to apply for a permit to demonstrate at the Alamance County Historic Courthouse.

167.    Assistant Chief Kristy Cole informed Plaintiff Simpson that she would have to submit written permission from the Alamance County Manager's Office along with her application for demonstration permit in order to hold a demonstration at the Historic Courthouse.

168.    On June 29, 2020 at 4:02 p.m., Plaintiff Simpson called Defendant Hagood's office to inquire about the process of acquiring written permission to demonstrate at the Alamance County Historic Courthouse.

169.    Plaintiff Simpson informed the individual who answered the phone in Defendant Hagood's office that she was applying for a protest permit with GPD and that the protest would be on county property at the Historic Courthouse.

170.    Plaintiff Simpson asked for Defendant Hagood's email address so she could request the written permission GPD told her was needed. The person she spoke with asked her what she needed the permit for, and she answered that she was applying for a protest permit. After waiting on hold, Plaintiff Simpson was told, "I'm not sure why Graham is telling you to contact the County Manager because the county does not issue any kind of protest permits. You'll have to go through the City of Graham."

38

171. Plaintiff Simpson explained again that she had been told by Assistant Chief Cole that she needed to gain written permission from the County Manager before she could even apply for a permit to demonstrate on the grass or steps outside the Alamance County Historic Courthouse.

172. Defendant Hagood's staff person responded that no protest would be allowed on courthouse grounds.

173. Plaintiff Simpson asked for clarification and Defendant's staff person repeated that no protests are allowed on courthouse grounds.

**Adam Rose**

174. Plaintiff Adam Rose became concerned about police and governmental overreaction to peaceful protests in Graham in early June 2020.

175. On June 2, 2020, Plaintiff Rose passed by the Historic Courthouse Square and was surprised to see neo-confederate demonstrators near the monument openly carrying firearms, in contravention of state law regarding public demonstrations.

176. At Graham's video (Zoom) City Council meeting June 9, 2020, Plaintiff Rose's written public comment was read aloud, expressing his concerns about the City's respecting free speech rights.

177. One of the Council Members stood up and left the meeting while Plaintiff Rose's comment was being read.

39

178.    On June 26, 2020 Plaintiff Rose filed an application for a permit to demonstrate at the Historic Courthouse Square. Plaintiff Rose indicated he planned to attend with five others on June 28 for a two-hour period.

179.    On June 27, Assistant Chief Cole informed Plaintiff Rose that his permit had been denied, and that no permits would be issued for an indefinite period of time.

### Plaintiff Gregory Drumwright

180.    On July 1, 2020, Plaintiff Drumwright applied for a permit to hold a large demonstration at the Historic Courthouse square in Graham on July 11, 2020.

181.    Soon after emailing the permit application to the GPD, Plaintiff Drumwright received an emailed acknowledgement of receipt of his application stating that it would be forwarded to GPD Lieutenant Flood, who would then follow up with Plaintiff Drumwright.

182.    Plaintiff Drumwright later telephoned Lt. Flood, who told Plaintiff Drumwright that he had seen Plaintiff's application and would get back to him about it.

183.    On July 3, Lieutenant Flood contacted Plaintiff Drumwright and said he was continuing to work on processing the permit application. Plaintiff Drumwright requested to meet with Lieutenant Flood on July 7, and Lieutenant Flood agreed.

184.    Plaintiff Drumwright was concerned that Defendants would not advise him whether his permit was granted in sufficient time to be able to plan and make arrangements for the July 11 demonstration.

40

185.    For that reason, on July 1, Plaintiff Drumwright called the Graham City Manager's office concerning his permit application. He was told during that call that Defendant Johnson was not allowing any permits for protests to be issued.

186.    On July 7 at the meeting with Lieutenant Flood, Plaintiff was told that because of the Temporary Restraining Order entered by this Court on July 6, the City's permit requirement was suspended, and that he would have to get a permit from the North Carolina Department of Transportation (NCDOT) to have marchers use the roundabout around the Historic Courthouse.

187.    Plaintiff Drumwright obtained permission from the NCDOT for street closures going into Graham from Burlington and near the Historic Courthouse for the Burlington- Graham March for Justice and Community ("the March for Justice") on July 11, 2020.

188.    The March for Justice ended with a rally at the stage on the Courthouse Square where there were various speakers and musical selections.

189.    Graham police and Alamance Sheriff personnel set up barriers, using tape, patrol cars, officers and deputies, to prevent people from accessing the Historic Courthouse grounds before, during, and after the March for Justice on July 11, 2020.

190.    Graham police and Alamance Sheriff personnel told Plaintiff Drumwright and those assisting him in setting up the stage and sound system on the morning of July 11 that they and everyone participating in their demonstration were prohibited from accessing the Historic Courthouse grounds, which they said was "county property."

191.    A young Black man who was assisting Plaintiff Drumwright with the March for Justice stage event was arrested at around 1:00pm on July 11 when he attempted to cross the Court Square on the southeast side near West Elm Street to deliver some papers to one of the speakers at the stage.

192.    Prior to his arrest, Graham Police Sargent Payne had given the young man permission to cross the Court Square to retrieve some papers for Plaintiff Drumwright from his vehicle on South Main Street.

193.    Plaintiff Drumwright plans to continue to go to Graham accompanied by other community members to demonstrate and protest peaceably in and around the Historic Courthouse square in Graham against white supremacy, police brutality and racial oppression.

## CLAIMS FOR RELIEF

### COUNT ONE
### VIOLATION OF FREE EXPRESSION, FREE ASSOCIATION, AND ASSEMBLY RIGHTS UNDER THE FIRST AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION
### 42 U.S.C. § 1983
### *On Behalf of All Plaintiffs Against All Defendants*

194.    The foregoing allegations are repeated and incorporated as though fully set forth herein.

195.    Plaintiffs assert a claim pursuant to 42 U.S.C. § 1983 for violation of the free expression, free association, and assembly rights protected under the First and Fourteenth Amendments to the U.S. Constitution. Plaintiff NAACP asserts this claim on behalf of itself and its members.

42

196. In the following paragraphs, references to the First Amendment include the First Amendment as applied to the states through the Fourteenth Amendment.

197. Defendants' policy and practice of prohibiting and restricting public protest in the Historic Courthouse square, including the sidewalk in front of and the steps of the Courthouse, is an unconstitutional restriction on free speech and assembly.

198. Defendants' practice of allowing protesters who support Confederate symbols to gather on the Historic Courthouse steps and area around the Confederate Monument, but prohibiting anti-racism protesters in the same place is a content- and viewpoint-based unconstitutional restriction on free speech and assembly.

199. Defendant Peterman's practice of declaring—and all Defendants' practice of enforcing—repeated Emergency Orders that suppress and restrict peaceful protests in Graham and its Historic Courthouse square is an unconstitutional restriction on free speech and assembly.

**COUNT TWO**
**VIOLATION OF DUE PROCESS RIGHTS UNDER THE FOURTEENTH**
**AMENDMENT TO THE UNITED STATES CONSTITUTION**
**42 U.S.C. § 1983**
*On Behalf of All Plaintiffs Against All Defendants*

200. The foregoing allegations are repeated and incorporated as though fully set forth herein.

43

201.    Plaintiffs assert a claim pursuant to 42 U.S.C. § 1983 for violation of due process rights protected under the Fourteenth Amendments to the U.S. Constitution. Plaintiff NAACP asserts this claim on behalf of itself and its members.

202.    Defendants' policies and practices with respect to unlawful Emergency Orders and restricting access to the Courthouse violate Plaintiffs' right to travel and freedom of movement under the Fourteenth Amendment because it is not narrowly tailored to a compelling or substantial government interest.

203.    Defendants' policies and practices with respect to unlawful Emergency Orders and restricting access to the Courthouse violate Plaintiffs' rights to due process because they are pretextual, and because Defendants issue and enforce these policies and practices arbitrarily.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that the Court grant the following relief:

(a)    Preliminarily and permanently enjoin, and enter a declaratory judgment stating that Defendants' policies and practices of prohibiting protest at the Historic Courthouse grounds violates Plaintiffs' rights to free speech and assembly under the First Amendment to the U.S. Constitution and to due process under the Fourteenth Amendment to the U.S. Constitution;

(b)    Preliminarily and permanently enjoin, and enter a declaratory judgment stating that Defendants' policies and practices of promulgating and enforcing Emergency Orders violates Plaintiffs' rights to free speech and assembly under

44

the First Amendment to the U.S. Constitution and to due process under the Fourteenth Amendment to the U.S. Constitution;

(c) Award Plaintiffs their reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and 28 U.S.C. § 1920 and as otherwise permitted by law; and

(d) Order such other relief as this Court deems just and equitable.

Respectfully submitted this 17th day of July 2020,

/s/ Kristi L. Graunke
 Kristi L. Graunke
 North Carolina Bar No. 51216
 kgraunke@acluofnc.org
 Daniel K. Siegel
 North Carolina Bar No. 46397
 dsiegel@acluofnc.org
 ACLU of North Carolina
 P. O. Box 28004
 Raleigh, NC 27611-8004
 Tel: 919-834-3466

/s/ Elizabeth Haddix
 Elizabeth Haddix
 North Carolina Bar No. 25818
 ehaddix@lawyerscommittee.org
 Mark Dorosin
 North Carolina Bar No. 20935
 mdorosin@lawyerscommittee.org
 Lawyers' Committee for Civil Rights Under Law
 P.O. Box 956
 Carrboro, NC 27510
 Tel. 919-914-6106

Vera Eidelman
New York Bar No. 5646088
veidelman@aclu.org
Emerson Sykes
New York Bar No. 5020078
esykes@aclu.org
ACLU Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Tel: 212-549-2500

C. Scott Holmes
Lockamy Law Firm
North Carolina State Bar No. 25569
scott.holmes@lockamylaw.com
3130 Hope Valley Road
Durham, North Carolina 27707
Tel: 919-401-5913

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that I filed the foregoing FIRST AMENDED COMPLAINT using the Court's CM/ECF system, and thereby notified all attorneys of record.


Submitted this 17th day of July 2020

By:     _/s/_ Elizabeth Haddix

Elizabeth Haddix
*Attorney for Plaintiffs*

Case 1:20-cv-00613-CCE-LPA   Document 27   Filed 07/17/20   Page 46 of 46