NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE,
et al.,

*Plaintiffs*,

v.

JERRY PETERMAN, et al.,

*Defendants.*

Civil Action No. 1:20-CV-00613

**ORAL ARGUMENT REQUESTED**

**BRIEF IN SUPPORT OF PLAINTIFFS' SECOND MOTION FOR
A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

**NATURE OF THIS ACTION**

This action challenges Defendants' policy and practice of prohibiting Plaintiffs and countless others from protesting on and around the Alamance County Historic Courthouse ("Courthouse") grounds. Notwithstanding a history and tradition of protest there, in the weeks since May 25, 2020—when the police killing of George Floyd sparked protests against police brutality nationwide—Defendants have banned protest on the Courthouse grounds; repeatedly erected barriers to close off the grounds; and issued emergency declarations further restricting protest and movement there, including an order issued on July 10 ("July 10 Order") that remains in place today.

Plaintiffs seek to gather and make themselves heard on the Courthouse grounds not only because it is a traditional site of protest, but also because its location is central to their

1

anti-racist message. Plaintiffs specifically seek to protest the continued presence of a Confederate monument in front of the Courthouse, as well as the glorification of slavery, white supremacy, and the racial oppression of Black people in Alamance County that the monument represents.

For nearly sixty years, the Supreme Court has recognized that the grounds of government buildings that are generally accessible and have historically been used for expressive activity are traditional public forums. *See Edwards v. South Carolina*, 372 U.S. 229, 235 (1963). And for nearly forty years, the Supreme Court has specifically recognized that the sidewalk abutting a courthouse is a traditional public forum. *See United States v. Grace*, 461 U.S. 171, 180 (1983). Defendants are therefore unconstitutionally restricting Plaintiffs' First Amendment rights to speak and assemble in a traditional public forum.

Plaintiffs wish to protest on the Courthouse grounds this coming weekend. In light of the ongoing and imminent irreparable harm they face—including as reflected in Defendants' recent arrests of peaceful protesters near the Courthouse—Plaintiffs respectfully request that this Court enter a temporary restraining order and preliminary injunction against Defendants' policy, practice, and July 10 Order banning protest at the Courthouse grounds.

## **FACTUAL BACKGROUND**

### I. **The Courthouse**

The Courthouse is located in the heart of downtown Graham (the "City"), and is the center of civic life in the City and Alamance County. It features prominent steps on each

2

of its four sides, and is surrounded by grassy lawns, a sidewalk, and a rotary called "Court Square." *See* Ex. 1 (Second Dodd Decl.) ¶¶ 2–3 (photos depicting Courthouse grounds); Ex. 2 (Second Brown Decl.) ¶ 7. People walk through the Square and along the sidewalk not only to get to the Courthouse, but also as a route to get to other locations around the City. *Id.* ¶ 17.

The Courthouse grounds—including the steps, sidewalk, and monument—have long served as a site of protest. People have traditionally gathered there to protest and make speeches on matters of public concern. For example, large numbers of people supporting Confederate symbols rallied on the steps and around the Confederate monument on July 18, 2015 and May 20, 2017. *See* Ex. 3 (Hosterman Decl.) ¶¶ 3–7; *Thousands attend pro-Confederate rally in Alamance County, ABC11* (July 18, 2015), https://abc11.com/pro-confederate-rally-alamance-county-confederate-flag-pro/862029/. Plaintiff NAACP has also held multiple demonstrations on the Courthouse steps, including a rally for voting rights in 2016. Ex. 2 ¶ 18. And Plaintiff Turner participated in marches and parades on the Courthouse grounds, including in Court Square, throughout high school. DE 2-3 (Turner Decl.) ¶ 2.

## II.     The Confederate Monument and Plaintiffs' Protests

On the north side of the Courthouse stands a Confederate monument. It sits in a landscaped square set off by concrete curbs. Ex. 1 ¶¶ 3–4; Ex. 2 ¶¶ 7–8. A brick sidewalk runs adjacent to the monument; it connects to the Courthouse sidewalk at one end and to

3

crosswalks to the corners of Court Square at the other. *Id.* ¶ 7. Pedestrians regularly use the designated crosswalk to cross through the Square. *Id*. ¶ 17.

The monument was erected in 1914 as a result of a coordinated statewide effort by the United Daughters of the Confederacy ("UDC"). Through placing these monuments in public squares around the state, the UDC sought to vindicate and glorify the Confederacy and to promote the "Lost Cause" mythology, a false historical narrative that downplayed the harm and significance of slavery and promoted racial segregation and white supremacy. *See* DE 2-2 (Kersey Decl.) ¶ 7; *see also* Karen L. Cox, *The Whole Point of Confederate Monuments Is to Celebrate White Supremacy*, Washington Post (Aug. 16, 2017), https://www.washingtonpost.com/news/posteverything/wp/2017/08/16/the-whole-point-of-confederate-monuments-is-to-celebrate-white-supremacy/.

The monument marks the spot where Graham's first Black city councilman, Wyatt Outlaw, was lynched by Alamance County's branch of the Ku Klux Klan in 1870. *See* Tammy Grubb, *No Plan to Move Alamance County Confederate Marker, Despite Burlington, Elon Request*, News & Observer (June 29, 2020), https://www.newsobserver.com/news/local/article243868472.html (updated July 2, 2020). The branch's founder, Confederate veteran Jacob A. Long, spoke at the monument's May 1914 dedication, telling those in attendance that they shared "a common interest: to recall the achievements of the great and good of our own race and blood." *Id*.

Today, Plaintiffs oppose the continued presence of the Confederate monument on the Courthouse grounds. They also seek to protest police brutality against Black people

4

and communities of color nationwide and in Alamance County. *See, e.g.,* DE 2-1 (NAACP Decl.) ¶¶ 4, 6; DE 2-3 ¶¶ 5–6; DE 2-4 (Dodd Decl.) ¶ 3; DE 2-8 (Simpson Decl) ¶¶ 13–15, 18; Ex. 2 ¶¶ 4, 6, 20; Ex. 4 (Second Clarke Decl.) ¶ 2; Ex. 5 (Second Rivera Decl.) ¶ 3; Ex. 6 (Second Rose Decl.) ¶ 2; Ex. 7 (Second Turner Decl.) ¶ 2.

Plaintiffs have specifically sought to hold their protests on the sidewalk beside the monument, and the sidewalk, grassy areas, and steps of the Courthouse. *See, e.g.,* DE 2-3 ¶¶ 7–15; DE 2-4 ¶¶ 3, 5, 8, 12, 14; DE 2-5 (Clarke Decl.) ¶ 14; DE 2-8 ¶¶ 2–11; Ex. 2 ¶¶ 6–8; Ex. 8 (Second Drumwright Decl.) ¶¶ 2, 4, 5. That location is central to their message of opposition to the Confederate monument's continued presence. They also seek to protest there because of the location's history and tradition of protest and its proximity to a seat of government power. *See, e.g.,* DE 2-7 (Rose Decl.) ¶ 22. They plan to protest there this Saturday, August 2, 2020. *See, e.g.,* Ex. 2 ¶ 20; Ex. 4 ¶ 3; Ex. 5 ¶ 4; Ex. 6 ¶ 3; Ex. 7 ¶ 3.

### III.   Defendants' Prohibitions on Protest at the Courthouse

Defendants currently have a policy and practice of prohibiting protest at or near the Courthouse. They have told individuals, including Plaintiff Simpson, that no protests are allowed on Courthouse grounds. DE 2-8 ¶¶ 2–11. And when protesters, including Plaintiff Turner, have requested permission in advance to protest on the Courthouse grounds, that permission has been denied. DE 2-3 ¶¶ 7–15. Alamance County Sheriff deputies and Graham police officers have also ordered individuals, including Plaintiff Dodd, off of the Courthouse sidewalks. DE 2-4 ¶¶ 6–9. They have arrested others, including NAACP

5

President Barrett Brown and a protester at Plaintiff Drumwright's July 11 rally, for protesting on the sidewalk surrounding the monument. *See* Ex. 2 ¶¶ 9–10; Ex. 8 ¶ 6.

In addition, since the nationwide protests against police brutality began, Defendant Johnson has repeatedly surrounded the Confederate monument and, at times, the Courthouse, with physical barriers—including sawhorses, deputies, and patrol vehicles—thereby obstructing access to (and protest on) the sidewalk and steps of the Courthouse, as well as the sidewalk surrounding the monument. *See*, *e.g.*, Ex. 1 ¶¶ 2–4; Ex. 8 ¶ 2. Defendants blocked access in this way on at least June 27, July 4, July 11, and July 25, 2020. *See* Ex. 1 ¶¶ 2–4; Ex. 2 ¶ 8; Ex. 8 ¶ 2.

## IV.    State of Emergency Declarations

Since the nationwide anti-policy-brutality protests began, Defendants have also been regularly issuing and enforcing "State of Emergency Declarations" that suppress protests at or near the Courthouse, despite the absence of any threatened or actual civil unrest, damage to property, or injury within City limits. *See*, *e.g.*, Ex. 2 ¶ 18; Ex. 8 ¶ 4.

### <u>May 31 – June 1 Order</u>

On May 31, Defendant Peterman issued the first such order, stating that it was "due to the potential for damage or injury, due to civil unrest." DE 27-2. Yet he did not cite any examples of threatened or actual civil unrest, damage to property, or injury within City limits. *Id*. The May 31 order included the following restrictions:

(a) Restricted Access: It shall be unlawful to disobey any barriers, warning signs or other structures that restrict vehicular or pedestrian travel due to road closure, detours, hazards, etc.

6

(b) Furthermore, this declaration denies or restricts access to areas, streets, highways or locations within the City in which that restriction or denial of access or use is reasonably necessary to promote efforts being made to overcome the emergency or to prevent further aggravation of the emergency.

*Id.* This order restricted access to City streets and the Courthouse grounds at Defendants' discretion.

On May 31, the Mayor amended the order to include the following additional terms:

(a) A curfew of 9 p.m. with the exception of Public Safety personnel, Doctors, Nurses and such other classes of persons as may be essential to the preservation of public order and immediately necessary to serve safety, health and welfare needs of the people within the City;

(b) A prohibition against travel to or within the Fire Limits as prescribed in Section 6-31 of the City of Graham Code of Ordinances;

(c) A prohibition against the possession, transportation, sale, purchase, and consumption of alcoholic beverages away from one's own premises;

(d) A prohibition against the use of dangerous weapons and substances unless permitted or exempted by Section 2-54(4) of the City of Graham Code of Ordinances or application General Statute.

DE 27-3. On June 1, 2020, the Mayor lifted the order and curfew.

### June 4 – June 9 Order

On June 4, 2020 at 9:01 p.m., Defendant Peterman issued the second order restricting people's movement "due to the potential for widespread or severe damage, injury, loss of life or property due to civil unrest." DE 27-4. Again, he did not cite any examples of threatened or actual civil unrest, damage to property, or injury within City limits. *Id*. The order stated that it would "remain in effect until June 9 at 6am unless it is rescinded prior." *Id*.

7

The June 4 order's restrictions and conditions were identical to the May 31–June 1 amended order—including a nightly curfew and restrictions on movement throughout the City—except that the curfew lasted from 9 p.m. to 6 a.m., and "citizens traveling to or from places of employment" were exempted. *Id*.

On June 5, 2020, the City posted an "FAQ sheet" about the curfew and order to its website. DE 27-5. The FAQ added the following restrictions:

(a) The curfew prohibits anyone within the City of Graham, between the hours of 9 p.m. and 6 a.m., from gathering or demonstrating on any public street, sidewalk, or public property.

(b) It also prohibits travel upon any public street unless it is for the purpose of seeking medical care, food, or other necessities for yourself or a family member.

(c) Violation of the curfew is punishable as a class 2 misdemeanor.

(d) All businesses are permitted to remain open during the nightly curfew if they choose to do so.

(e) Unnecessary additional travel or lingering in public space is prohibited.

*Id.*

On June 5, 2020 at 4:52 p.m., the City posted a comment on its official Facebook page, alongside a photo of the June 4 order, that "[p]reventative actions are being taken to manage the potential for widespread damage, injury, or loss of life or property due to civil unrest." DE 27-6.

That same evening, Defendant Peterman published the following message on the City's website, again with no identification of any "unrest" or emergency that was in fact occurring or imminent:

8

[A] State of Emergency does more than impose restrictions on human behavior, such as a curfew our residents must follow. This procedure legally sets into motion several *behind the scenes processes* the City can employ to ensure safety and security of all.

DE 27-7 at 1 (emphasis added). On June 9, the City posted to its website that the order had been rescinded. DE 27-8.

### June 20 – June 22 Order

On June 20, 2020, the City announced the third emergency order by Defendant Peterman "due to the potential for widespread or severe damage, injury, loss of life or property due to civil unrest." DE 27-9. Once again, neither Defendant Peterman nor the City cited any examples of imminent or actual civil unrest, damage to property, or injury or loss of life within City limits. *Id*.

The June 20 order included the following restrictions and conditions:

a. A curfew of 9:00 pm with the exception of police officers, firefighters, doctors, nurses and such other classes of persons as may be essential to the preservation of public order and immediately necessary to serve the safety, health and welfare needs of the people within the City and citizens traveling to or from places of employment;

b. [A] prohibition against the use of dangerous weapons and substances unless permitted or exempted by Section 2-54(4) of the City of Graham Code of Ordinances or applicable General Statute.

*Id.* On June 22, 2020, the City posted to its website that the order had been rescinded. DE 27-10.

### June 25 – June 29 Order

On June 25, 2020, the City posted a press release to its website announcing a fourth emergency order by Defendant Peterman, again purportedly "due to the potential for

9

widespread or severe damage, injury, loss of life or property due to civil unrest." DE 27-11. This order was identical to the June 20 order. *Id.* And again, neither Defendant Peterman nor the City cited any examples of threatened or actual civil unrest, damage to property, or injury or loss of life within City limits. *Id.*

On June 26, 2020, at around 12:00 p.m.—soon after Plaintiffs Kersey and Turner submitted their applications for protest permits to the City (DE 2-2 ¶ 5, DE 2-3 ¶ 7)—Defendant Johnson posted the following to his official Facebook page: "[E]ffective June 26, 2020, no permits to protest in the city of Graham, NC to include the Alamance County Courthouse have been granted, nor will be granted for the foreseeable future. Any group(s) attempting to protest without a permit, will be in violation and subject to arrest." DE 27-12. A few hours later, he posted this update: "The Alamance County Sheriff's Office DOES NOT participate in the permitting process for the city of Graham, NC. We are assisting the city of Graham, NC by providing them our social media platforms to help get the word out of their decision, so the public may be so informed." DE 27-13. When the Sheriff declared a protest permit ban, the City had not yet done so.

However, the next day, on June 27, 2020, the City posted an "Amended Declaration of State of Emergency" to its website. DE 27-14. Under this amended order, the curfew began at 8 p.m. instead of 9 p.m., and "the issuance of parade and demonstration [sic]" was temporarily suspended "based on a clear and imminent threat to public safety." *Id.*

The City posted the following Media Release from the Graham Police Department about the amended order:

> Graham Police Department has been receiving viable intelligence about a large group of individuals demonstrating at the historic courthouse located at the court-square on 06/27/2020. A peaceful protest was planned for this date, but a permit was denied. The coordinators of that event have since canceled their planned event. However, we found that another group of people were planning to come that were unrelated to the original group. The intel we received showed that the people had been involved with other protests in the state that had turned violent. In response to this potential threat we upstaffed to prepare for the large crowd and requested mutual aid from multiple agencies. The mayor also amended the current state of emergency to include a temporary suspension of the issuance of parade and demonstration permits due to the clear and imminent threat to public safety.

DE 27-15. On June 27, 2020, Defendants also placed barricades around the Courthouse grounds, further restricting protesters' access to the grounds. *See* Ex. 1 ¶ 2. On June 29, 2020 at 3:52 p.m., the City posted to its official Facebook page that the order had been rescinded.

**July 10, 2020 Order**

On July 10, 2020, Defendant Peterman issued a fifth "Declaration of State of Emergency" ("the July 10 Order"), covering the area outlined in red below, including the Courthouse grounds, which stand in the circle in the center of the bottom third of the restricted area:[1]

---

[1] City of Graham, July 10 Order, Facebook (July 10, 2020), https://perma.cc/9FKZ-9LK9.

11



The July 10 Order made it "unlawful to disobey any barriers, warning signs or other structures that restrict vehicular or pedestrian travel due to road closure, detours and/ or hazardous conditions," and "to use dangerous weapons and substances as those terms are defined in N.C.G.S. 14-288.1 unless permitted or exempted by Section 2- 54(4) of the City of Graham Code of Ordinances or applicable General Statute." DE 27-16.

As they had done previously, on July 11 and 12, 2020, Defendants placed barricades around the Courthouse grounds, invoking the barrier provision of the Order and further obstructing protesters' access to the public land. Ex. 1 ¶ 4; Ex. 8 ¶ 3. At least one man was arrested for walking past the barriers on July 11. Ex. 8 ¶ 6.

12

On July 12, the City posted on its website "SOE – Rescinded"; however, the text of that post reads: "Mayor Jerry Peterman has rescinded the Declaration of the State of Emergency initiating the curfew for the City of Graham (June 29, 2020)." *See* Ex. 9. Therefore, the July 10 Order remains in place.

On July 25, 2020, Defendants again placed barricades on the Courthouse grounds, including around the Confederate monument, limiting protester access. Barrett Brown, the President of Plaintiff NAACP, and several other protesters were arrested for standing on the sidewalk surrounding the Confederate monument. Ex. 2 ¶¶ 9–10.

## QUESTIONS PRESENTED

1. Do Plaintiffs demonstrate a likelihood of success on their claims that:

    a. Defendants' policy and practice of prohibiting protest on the Courthouse grounds violates the First Amendment?;

    b. Defendants' July 10 Order violates the First Amendment?

2. Do Plaintiffs satisfy the other requirements for preliminary injunctive relief?

## ARGUMENT

To obtain preliminary relief, Plaintiffs must demonstrate that they are likely to succeed on the merits of their claim; they are likely to suffer irreparable harm if preliminary relief is not granted; the equities favor preliminary relief; and such relief serves the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *U.S. Dep't of Labor v. Wolf Run Mining Co.*, 452 F.3d 275, 281 n.1 (4th Cir. 2006). Plaintiffs satisfy each of these requirements.

13

## I.  Plaintiffs are likely to succeed on the merits.

Plaintiffs are likely to succeed on the merits of their claim because the Courthouse grounds—including the sidewalks, steps, and grass surrounding the Courthouse and the Confederate monument—constitute a traditional public forum, and Defendants' policies, practice, and repeated orders (including the still-in-effect July 10 Order) prohibiting protest there do not satisfy heightened First Amendment scrutiny.

### A.  The Courthouse grounds constitute a traditional public forum.

"[C]ourts should evaluate First Amendment rights on government-owned property under a public forum analysis." *Warren v. Fairfax Cnty.*, 196 F.3d 186, 190 (4th Cir. 1999) (citing *Ark. Educ. Television Com'n v. Forbes*, 523 U.S. 666, 676 (1998) ("*Ark. Educ.*")). There are "three types of fora: the traditional public forum, the public forum created by government designation, and the nonpublic forum." *Cornelius v. NAACP Legal Defense & Ed. Fund, Inc.,* 473 U.S. 788, 802 (1985). First Amendment rights are at their zenith in traditional public forums—that is, "public places historically associated with the free exercise of expressive activities, such as streets, sidewalks, and parks[.]" *United States v. Grace*, 461 U.S. 171, 177 (1983) (citations and marks omitted).

### i.  The Courthouse grounds are a quintessential traditional public forum.

"Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Hague v. Comm. for Indus. Org.*, 307 U.S. 496, 515 (1939). Indeed, "[s]uch use of the

14

streets and public places has, from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens." *Id.* These traditional public forums do "not lose [their] historically recognized character" simply because they abut a courthouse. *Grace*, 461 U.S. at 180 (holding that the "public sidewalks forming the perimeter of the Supreme Court grounds . . . are public forums and should be treated as such for First Amendment purposes"). *See also O'Connell v. Town of Burgaw, N.C.*, 262 F. Supp. 3d 316, 320 (E.D.N.C. 2017) (holding that "County Courthouse Square and its surrounding public streets and sidewalks are traditional public fora").

As the Fourth Circuit has recognized, the Supreme Court has not "strictly limited the traditional public forum category to streets, sidewalks, and parks." *Warren v. Fairfax Cty.*, 196 F.3d 186, 192 (4th Cir. 1999). Rather, it has recognized everything from a leased municipal theater, *id.* (citing *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546 (1975)); to a state fair, *id.* (citing *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640 (1981)); to the grounds of a state capitol, as public forums, *id.* (citing *Edwards*, 372 U.S. 229).

*Edwards v. South Carolina* is particularly instructive. Considering the rights of protesters to gather on state capitol grounds, the Supreme Court held that "assembl[ing] at the site of the State Government and there peaceably express[ing] . . . grievances 'to the citizens of [the state], along with the [government]" constitutes "an exercise of . . . basic constitutional rights in their most pristine and classic form." 372 U.S. at 235 (footnote omitted).

Case 1:20-cv-00613-CCE-LPA   Document 48   Filed 07/28/20   Page 15 of 27

Similarly, in *Warren v. Fairfax County*, the Fourth Circuit held that the sidewalk and grassy areas outside of "a seat of legislative and/or executive power" are "typical traditional public forum[s]." 196 F.3d at 190, 191. *See also id.* at 196 ("In general, the grounds . . . of state and federal capitol complexes . . . have consistently been held to be public fora." (alterations in original; citations omitted)); *Occupy Columbia v. Haley*, 738 F.3d 107, 121–22 (4th Cir. 2013) (relying on *Grace* and *Edwards* to hold that "the area outside of the State House [i]s a public forum for First Amendment purposes").

What was true of the public spaces in *Grace*, *Edwards*, *Warren*, and *Occupy Columbia* is equally true of the Courthouse grounds in Graham: they surround a seat of government power and have historically provided an area for public speech and assembly. *See also Smith v. Cty. of Albemarle, Va.*, 895 F.2d 953, 958–59 (4th Cir. 1990) (affirming district court's holding that courthouse lawn is either a traditional public forum or at least a designated public forum in part because it is "the lawn in front of a seat of government," which "is similar to other settings found to be a traditional public forum").

### ii. *A particularized inquiry also shows that the Courthouse grounds are a traditional public forum.*

"[A] court can generally treat a street, sidewalk, or park as a traditional public forum without making a 'particularized inquiry.'" *Warren*, 196 F.3d at 191 (quoting *Frisby v. Shultz*, 487 U.S. 474, 481 (1988)). But even if the Court were to engage in a particularized inquiry here, the Courthouse grounds would qualify as a traditional public forum.

"The Court distinguishes between [types of] fora based upon the physical characteristics of the property, including its location; the objective use and purposes of the

16

property; and government intent and policy with respect to the property, which may be evidenced by its historic and traditional treatment." *Id.* at 191 (footnote and citations omitted); *see also Ark. Educ.*, 523 U.S. at 677. Though "[n]one of these factors is dispositive," each is met here. *Warren*, 196 F.3d at 191.

The physical characteristics and central location of the Courthouse grounds match the Supreme Court's description of a traditional public forum because they are "continually open, often uncongested, and constitute[] not only a necessary conduit in the daily affairs of a locality's citizens, but also a place where people may enjoy the open air or the company of friends and neighbors in a relaxed environment." *Heffron*, 452 U.S. at 651. The sidewalks around the Courthouse and the Confederate monument connect to streets and crosswalks on all sides, and are regularly used by pedestrians and joggers. *See Warren,* 196 F.3d at 189 (holding that "the physical characteristics of a traditional public forum" include "an open public thoroughfare").

The second factor to consider is whether the property's "objective use is as a place of open public access, which is eminently compatible with expressive activity." *Id.* at 189–90. The Courthouse has a variety of uses, including County Commission hearing rooms, offices and courtrooms. *See* Ex. 2 ¶ 17. While all of the offices inside may not be open to the public at all times, the character of a multi-use government building is inherently public. *See Lederman v. United States*, 291 F.3d 36, 41 (D.C. Cir. 2002) (holding that "courts have long recognized that the Capitol Grounds as a whole meet the definition of a traditional public forum"). Similarly, the Confederate monument is on the Courthouse

17

grounds and adjoins a public sidewalk, which invites and enables members of the public to walk and gather around it.

Moreover, "[t]he test is not whether the property was designed for expressive activity, but whether the objective uses and purposes of the property are compatible with the wide measure of expressive conduct characterizing public fora." *Warren*, 196 F.3d at 195. *See also id.* ("[T]he traditional public fora of streets, sidewalks, and parks are not primarily designed for expressive purposes"); *Grayned v. City of Rockford,* 408 U.S. 104, 116 (1972) ("The crucial question is whether the manner of expression is basically incompatible with the normal activity of a particular place at a particular time.").

Here, the Courthouse sidewalk, steps, and grass, as well as the Confederate monument and surrounding sidewalk, are clearly used for and compatible with expressive conduct, as shown by their history as sites of protest and their location before a seat of government power. *See Warren*, 196 F.3d at 190. Countless protests, rallies, demonstrations, and other assemblies have occurred on the Courthouse grounds for more than a century—from the initial dedication of the Confederate monument Plaintiffs now seek to protest to more recent protests by those supporting Confederate symbols and Plaintiffs themselves. *See* Ex. 2 ¶ 18; Ex. 3 ¶¶ 3–7; DE 2-3 ¶ 2.

In sum, much like the area around the legislative and executive buildings the Fourth Circuit considered in *Warren* and *Occupy Columbia*, the Courthouse grounds are "outdoors, unenclosed, publicly accessible, and in fact open to the public." *Warren*, 196 F.3d at 188. And, like the land at issue in *Warren*, the Courthouse grounds are "strikingly

similar to property already determined by the Supreme Court to be a traditional public forum . . . and which, lying directly in front of a seat of government power, is part of a class of property traditionally open to expressive activity." *Id.* at 196.

### B. Defendants' policy, practice, and July 10 Order prohibiting protest on Courthouse grounds fail heightened scrutiny.

"A bedrock First Amendment principle is that citizens have a right to voice dissent from government policies." *Occupy Columbia*, 738 F.3d at 122 (quoting *Tobey v. Jones*, 706 F.3d 379, 391 (4th Cir.2013)). "'[W]hen that speech takes place in a "quintessential public forum,' the ability "of the state to limit expressive activity are sharply circumscribed." *Id.* (quoting *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983)). In such a forum, "[t]he government's ability to permissibly restrict expressive conduct is very limited: the government may enforce reasonable time, place, and manner regulations as long as the restrictions 'are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication.'" *Grace*, 461 U.S. at 177 (quoting *Perry*, 460 U.S. at 45).

To satisfy this standard, "the government is obliged to demonstrate that it actually tried or considered less-speech-restrictive alternatives and that such alternatives were inadequate to serve the government's interest." *Billups v. City of Charleston*, 961 F.3d 673, 688 (4th Cir. 2020). "Absent such a showing, [courts] cannot simply accept the City's assurances that [alternatives] … would be too difficult to enforce or would not sufficiently safeguard its interest[.]" *Id.* at 689.

19

Here, Defendants' policy of prohibiting *any* protest on the Courthouse sidewalk, steps, or grass, their practice of barricading the area off from protest, and their July 10 Order further restricting access to and around the Courthouse grounds cannot meet this standard. In *Warren*, the Fourth Circuit held that a law banning non-residents from the legislative and executive grounds was unconstitutional because it "serve[d] no compelling interests and it [was] not narrowly tailored to achieve the interests that it does serve." 196 F.3d at 190. The same is even more true here, where the ban applies not only to non-residents, but to all protesters, and there is a history of protests occurring at the Courthouse without incident.

Even if Defendants could articulate a compelling interest, a complete ban on protest at the Courthouse—whether through a blanket policy, the practice of erecting barriers, or weekly orders restricting access under the guise of an "emergency"—would not be a reasonably tailored solution. As the Supreme Court has recognized, a total ban on expression on public sidewalks outside of a courthouse does not substantially serve any government purpose. *Grace*, 461 U.S. at 182. A court need not "denigrate the necessity to protect persons and property or to maintain proper order and decorum within the . . . Court grounds" in order to "question whether a total ban on [protesting] on the public sidewalks [in front of the Court] substantially serves these purposes." *Id. See also Cox v. City of Charleston*, 416 F.3d 281, 285 (4th Cir. 2005) (holding that an ordinance requiring a permit for any gathering on public property violated the First Amendment in part because it "significantly restricted a substantial quantity of speech that does not impede the

20

[government's] permissible goals."); *Occupy*, 738 F.3d at 125 ("[T]he right of the protesters to assemble and speak out against the government on the State House grounds in the absence of valid, time, place, and manner restrictions has been clearly established since *Edwards v. South Carolina*."); *cf. Hoffman v. Hunt*, 126 F.3d 575, 582 (4th Cir. 1997) (recognizing that threatening protesters who were not obstructing or blocking access to or egress from a building with arrest was unconstitutional).

This analysis applies equally to the July 10 Order, which was improperly issued as an "emergency" declaration. "Only when local law enforcement is no longer able to maintain order and protect lives and property may the emergency powers be invoked." *United States v. Chalk*, 441 F.2d 1277, 1280 (4th Cir. 1971). Under state law, a declaration of emergency must be based on an "occurrence or imminent threat of widespread or severe damage, injury, or loss of life or property[.]" N.C. Gen. Stat. § 166A-19.3(6); *see also* N.C. Gen. Stat. § 166A-19.22 (discussing municipal authority to issue emergency declarations). Defendants were not facing any such emergency when Defendant Peterman invoked the emergency powers on July 10. *See* Ex. 2 ¶ 18; Ex. 8 ¶ 4. While Defendant Peterman generically stated that the state of emergency was necessary "due to an imminent threat of widespread or severe damage, injury, loss of life [sic]," the Order does not set forth any factual basis for its necessity, *see* DE 27-16.[2] Defendants cannot simply cry "emergency!"

_____

[2] Nor has Defendant Peterman offered such a factual basis for any of the repeated orders he has issued nearly every weekend since late May 2020, *see* DE 27-2, 27-3, 27-4, 27-6, 27-7, 27-9, 27-11, 27-14. The most specific justification was for the June 27 Amended Declaration—which set an 8 p.m. curfew and suspended the issuance of any permits during the day based on "viable intelligence about a large group of individuals demonstrating at

21

to avoid the constitutional scrutiny that applies to restrictions on speech in a traditional public forum. *See, e.g., Antietam Battlefield KOA v. Hogan*, No. CV CCB-20-1130, 2020 WL 2556496, at *5, n.15 (D. Md. May 20, 2020) (refusing to apply *Chalk* to an executive order where "civil control had [not] broken down to the point where emergency measures [we]re necessary" (quoting *Chalk*, 441 F.2d at 1281)).

Even under the Fourth Circuit's emergency order caselaw, "the executive's decision that civil control has broken down to the point where emergency measures are necessary is not conclusive or free from judicial review." *Chalk*, 441 F.2d at 1281. Rather, courts can consider "whether the mayor's actions were taken in good faith and whether there [was] some factual basis for his decision that the restrictions he imposed were necessary to maintain order." *Id*. at 1281 (citations omitted). Here, the answer to both questions is "no."

In *Chalk*, the Fourth Circuit upheld an emergency declaration that came after weeks of actual and threatened civil unrest—including a clash between police officers and more

---

the historic courthouse . . . [that] showed that the people [who were planning to come] had been involved with other protests in the state that had turned violent." *See* DE 27-14, DE 27-15. In other words, Defendant Peterman imposed an 8 p.m. curfew and complete ban on any protest due to "intel" that people planned to protest on the Courthouse grounds, a traditional public forum, and that some of them had been at protests in the past where other individuals had engaged in violence. This cannot justify a complete ban on movement at night and expression during the day. *See, e.g., Collins v. Jordan*, 110 F.3d 1363, 1372–73 (9th Cir. 1996); *cf. Schleifer by Schleifer v. City of Charlottesville*, 159 F.3d 843, 849, 852 (4th Cir. 1998) (upholding juvenile curfew because it was based on "information from many sources," including "a survey of public opinion, news reports, data from the United States Department of Justice, national crime reports, and police reports," and because it specifically exempted First Amendment activity).

than 200 high school students that involved broken windows, damaged cars, and flying missiles that a dispersal order failed to quell; "the unanimous recommendations of local, state, and federal law enforcement officials"; and a number of brush fires and the discovery of Molotov cocktails stored around the city. *Id*. at 1282–83. By contrast, there is no history or evidence of civil unrest here. Rather than any real necessity, the July 10 Order—and the orders that came before it—appear to have been motivated by distaste for Plaintiffs' message or concerns about listeners' reaction to that message—both constitutionally impermissible bases.

"As the Supreme Court has said in the First Amendment context, the government 'must do more than simply posit the existence of the disease sought to be cured.'" *Schleifer by Schleifer v. City of Charlottesville*, 159 F.3d 843, 849 (4th Cir. 1998) (quoting *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 664 (1994)). "It must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Id* (citing *Turner*, 512 U.S. at 664). Defendants cannot make that demonstration here.

Rather, Defendants have attempted to withdraw the Courthouse grounds as a traditional public forum through three separate tools: a policy of prohibiting protest on the Courthouse grounds, a practice of regularly barricading the grounds from public access, and emergency orders further restricting movement near and around the Courthouse. This they cannot do: the government "may not by its own *ipse dixit* destroy the 'public forum'

23

status of streets and parks which have historically been public forums." *Grace*, 461 U.S. at 180.

## II.     Plaintiffs are irreparably harmed.

"[L]oss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373 (1976). Without prompt relief, Plaintiffs will not be able to exercise their First Amendment freedoms, including by protesting over the coming weekend.

## III.     The balance of equities and public interest favor preliminary relief.

The balance of equities also weighs in favor of Plaintiffs. Defendants' policy, practice, and July 10 Order obstruct Plaintiffs' exercise of their constitutional rights, causing them great harm. Meanwhile, no harm will come to Defendants if Plaintiffs are allowed to engage in protected speech. *See Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002) (injunction of a likely unconstitutional law does not harm the government). The balance therefore weighs in favor of preliminary injunctive relief, and upholding constitutional rights "surely serves" the public interest. *Id.*

## CONCLUSION

For the reasons stated, Plaintiffs' Second Motion for a Temporary Restraining Order and Preliminary Injunction should be granted.

24

Respectfully submitted,                    Dated: July 28, 2020

/s/ Kristi L. Graunke
  Kristi L. Graunke                        Vera Eidelman
  North Carolina Bar No. 51216             New York Bar No. 5646088
  kgraunke@acluofnc.org                    veidelman@aclu.org
  Daniel K. Siegel                         Emerson Sykes
  North Carolina Bar No. 46397             New York Bar No. 5020078
  dsiegel@acluofnc.org                     esykes@aclu.org
  ACLU of North Carolina                   ACLU Foundation
  P. O. Box 28004                          125 Broad Street, 18th Floor
  Raleigh, NC  27611-8004                  New York, NY 10004
  Tel: 919-834-3466                        Tel: 212-549-2500

/s/ Elizabeth Haddix                       /s/ C. Scott Holmes
  Elizabeth Haddix                         C. Scott Holmes
  North Carolina Bar No. 25818             Lockamy Law Firm
  ehaddix@lawyerscommittee.org             North Carolina State Bar No. 25569
  Mark Dorosin                             scott.holmes@lockamylaw.com
  North Carolina Bar No. 20935             3130 Hope Valley Road
  mdorosin@lawyerscommittee.org            Durham, North Carolina 27707
  Lawyers' Committee for Civil Rights Under Law   Tel: 919-401-5913
  P.O. Box 956
  Carrboro, NC 27510
  Tel. 919-914-6106

                                           *Counsel for Plaintiffs*

25

## CERTIFICATE OF COMPLIANCE

Relying on the word count function of Microsoft Word, I hereby certify that this brief complies with the word limitations set forth in LR 7.3.


/s/ Kristi L. Graunke
*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that on July 28, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notice to counsel for Defendants.

/s/ Kristi L. Graunke
*Counsel for Plaintiffs*