IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
Case No. 1:20- CV-613-CCE-LPA

| | |
|---|---|
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, Alamance County Branch, et al., | )<br>)<br>)<br>) |
| Plaintiffs, | )<br>) **RESPONSE IN OPPOSITION TO**<br>) **MOTION FOR TEMPORARY**<br>) **RESTRAINING ORDER** |
| v. | )<br>) |
| JERRY PETERMAN, et al., | )<br>) |
| Defendants. | ) |

Quite often, the best advocacy involves picking up the phone and calling the other side. This second TRO, like the first, should have been such an occasion. Undersigned counsel has repeatedly asked counsel for Plaintiff to discuss any concerns Plaintiffs have, conveying his mobile phone number and the invitation to call at any time. Unfortunately, Plaintiff declined to do so regarding this TRO, instead again raising their concerns first through another TRO motion and treating the City of Graham and its police department as if they were enemies of Plaintiffs. That is simply not the case.

The "State of Emergency" over which Plaintiffs now seek emergency relief was rescinded July 12. There are no other such declarations in effect or pending in Graham. Further, the City of Graham does not own, control or regulate the Alamance County Courthouse or Confederate monument and never has. Those properties are the jurisdiction of the County (and to lesser extent, the State). Accordingly, the Graham defendants respectfully suggest the motion against them should be denied and counsel for Plaintiff strongly encouraged to meet and confer with counsel for the Defendants before filing any more emergency motions.

These are serious times and serious issues confronting our communities. Businesses in

Graham, like businesses throughout the State, have never faced more difficult circumstances. Racial tensions have not been worse since the early 1970s. At times like this, attorneys should be working together to find solutions and ways to lower anxiety and fears, not spending their efforts pursuing ambush tactics and trying to portray parties in the most antagonistic light, particularly where such portrayals are demonstrably false and involve incendiary issues.

## FACTS

This case centers on the literal center of downtown Graham, North Carolina where the Alamance County Courthouse resides in the middle of a busy traffic circle. A 105-year-old, solid cement memorial statute of a Confederate soldier stands outside the entrance to the courthouse on the edge of the road, with a crosswalk along its western edge for accessing the courthouse. There is a small patch of flowers around the memorial, and then a curb and the road. It is an active downtown, with several quaint shops and an ice cream stand. As a result, the square typically features a lot of traffic, though less in recent weeks.[1]

Alamance County owns the Courthouse property and the State of North Carolina owns the road around the Courthouse. Either the County or the State owns the statue. The City of Graham owns none of this disputed property and has no policies, practices or orders concerning protests regarding or access to these properties.

---

[1] The Graham Defendants file herewith declarations from Graham's city manager, Frankie Maness, and Graham's acting police chief, Kristi Cole.



Plaintiffs sued the City of Graham over a 40-year-old permitting ordinance that the City was working on rewriting prior to the Covid-19 pandemic. The City was not aware of any concerns or objections to the ordinance until it received the first TRO motion in this case. Since the City was already in the process of rewriting the ordnance, it simply rescinded the ordinance pending the rewrite in an effort to avoid an unnecessary fight.[2]

Plaintiff's latest TRO seeks an injunction against the City of Graham's State of Emergency ("SOE") declaration entered July 10, 2020. Plaintiff argues the SOE was a subterfuge for repressing the protest rights of Plaintiff. That is an unfortunate and gross misrepresentation of the SOE, a copy of which is attached hereto at Exhibit A. The SOE had two primary objectives, expressly identified in the SOE:

---

[2] Contrary to Plaintiff's repeated defamatory insinuations in its pleadings, the City of Graham is not a haven for racism or police violence and has never conspired to repress Plaintiff's peaceful protests. To the contrary, Graham has a reputation for being a family friendly, small southern town and its internal policies and practices value racial diversity, as is demonstrated by the racial diversity of its police force and its city leadership. Graham personnel have put in many long hours trying to keep Graham safe for Plaintiff and a place where Graham citizens can still try to enjoy their downtown once businesses downtown reopened.

3

**Section 3.**

The following limitations in the conduct of citizens and visitors of the City are hereby imposed within the emergency area:

- **Restricted Access:** It shall be unlawful to disobey any barriers, warning signs or other structures that restrict vehicular or pedestrian travel due to road closure, detours and/or hazardous conditions;
- **Prohibition Against the Use of Weapons and Substances:** It shall be unlawful to use dangerous weapons and substances as those terms are defined in N.C.G.S. 14-288.1 unless permitted or exempted by Section 2-54(4) of the City of Graham Code of Ordinances or applicable General Statute.

The SOE allowed the City to erect barricades to redirect traffic and to separate pedestrian from vehicular traffic. Plaintiffs planned a march from Burlington to Graham. In response, the North Carolina Department of Transportation sanctioned the closing of roads to facilitate the march. In turn, the City of Graham restricted vehicular access to the route by erecting barricades along the march route. This was done to prevent vehicular traffic from entering the march route and to keep pedestrians out of the trafficways.

The prohibition against the use of weapons was entered due to threats of violence, to include threats of violence directed against the protestors. Contrary to Plaintiff's representations to this Court, the SOE was intended to, and in fact did, protect Plaintiff's march and protest activities.

Consistent with the concerns that gave rise to the July 10 SOE, on July 10 and 11, Plaintiff's attorney, Elizabeth Haddix, expressed her and her clients' concerns about potential violence at the protest. In fact, Ms. Haddix argued that the SOE did not go far enough in protecting against the use of weapons in and around the protest area. Ms. Haddix explained, "[t]hey and we are concerned for the safety of the hundreds of people they expect to be participating in their planned peaceful demonstration." See Ex. B hereto. On the day of the July 11 march, from the protest, Ms. Haddix contacted counsel for Defendants to report that counter protestors were using spears for flag poles. See Ex. C hereto.

4

By all accounts, the July 11 protest and counter-protest occurred peacefully and without incident. The "spear" flagpoles turned out to be PVC pipes. See Ex. C. Approximately 400 protestors marched from Burlington into downtown Graham and approximately 100 counter-protestors awaited their arrival. The City of Graham closed the march route and closed the streets around the County Courthouse and Confederate statue to traffic to facilitate the march and to protect its participants. The City facilitated the setting up of a stage immediately in front of the statute for Plaintiff's to use.

 

The protestors assembled in the packed traffic circle and literally under the shadow of the confederate statue, and from the stage, gave speeches denouncing racism and the presence of the confederate statue:

5



"They are speaking underneath the Confederate Statue …" Chris Peterson, WXII News Live Broadcast, July 11, 2020 (https://www.wxii12.com/article/graham-protesters-confederate-statue-state-of-emergency/33283923 ).

The Graham police department barricaded the counter-protestors away from Plaintiff's protestors and did not allow the presence of weapons anywhere near the protest activities.



After Plaintiff's march and protest on the courthouse square, on July 12, the City of Graham terminated the July 10 SOE and posted it to the City's website that same day, where it remains published:



A copy of the termination is attached hereto as Exhibit D. The City was surprised again to receive Plaintiff's TRO motion on July 28 seeking an injunction against a SOE that was publicly rescinded two weeks ago, and was disappointed to read the false arguments therein that the SOE was enacted to repress Plaintiff's protest rights. Precisely the opposite is true.

At approximately 8pm, the evening of July 28, on the heels of filing the second TRO motion in this case, Ms. Haddix called undersigned counsel for the first time since July 11 to report that the Graham Police Department together with the Alamance County Sheriff's Department had disbursed and prevented peaceful protests from taking place across the street from the Confederate statue. Ms. Haddix warned that the alleged misconduct would be further "ammunition" for Plaintiff's TRO hearing on Thursday, July 30. Ms. Haddix said she had video evidence of the police harassment. Subsequent investigation that evening revealed that a Graham police officer stopped a protestor earlier in the day from spray painting graffiti on the sidewalk to determine whether she was using paint or washable chalk spray. When the protest group

responded aggressively to the questioning, nearby Alamance County Sheriff's deputies came over to provide assistance.[3] Protests otherwise continued unabated that evening, as they have nearly every evening in downtown Graham for the past several weeks.

The next day, July 29, Ms. Haddix sent a link to the aforementioned video. See Exhibit D hereto. The video is a Facebook post that shows three to four sheriff's deputies standing passively and silently with hands in their pockets while protestors criticize them with profanity because an officer checked to see whether a protestor was painting the sidewalk with paint. Eventually, the sheriff's deputies returned to the courthouse. Thereafter, at approximately 4:35 into the video, a protestor explains, "No, they did not tell us we could not protest, they tried to tell us not to deface the sidewalk with spray paint, but this is chalk."[4]

With regard to the disputed Confederate monument and county courthouse, the City of Graham (to include its assorted individual defendants named in this case), has no policies or practices regarding protests, access or otherwise to the Confederate monument or to the county courthouse. There is a simple reason for this -- the City owns none of these properties and is not responsible for them. The Alamance County Courthouse and surrounding areas are owned and controlled by the County, as the name would suggest. The 105-year-old Confederate monument is owned by either the County or the State (the statue sits in a state public right of way roadway). The City and its personnel have not patrolled or guarded these properties. At all times relevant to this case, those properties have been and remain the jurisdiction of Alamance County. Finally, the City of Graham does not have any proposal in front of it, nor is it presently contemplating, a Statement of Emergency for this weekend, July 31 through August 2, 2020, or otherwise.

---

[3] On the same evening at a separate time, officers told protestors to "move along" who were harassing people that were attempting to eat ice cream from the custard shop across the street from the courthouse.
[4] https://www.facebook.com/ayemee.collier/videos/748900245845126/?t=245

8

Contrary to Plaintiffs' continual allegations and uncharitable insinuations to the contrary, the City of Graham is not and has never been Plaintiffs' "opponent" or antagonist, other than being sued by Plaintiffs. To the contrary, the City has worked arduously for weeks, despite dealing with numerous issues and short staffing related to the Covid-19 pandemic, to facilitate and protect Plaintiff's First Amendment Rights.

## ARGUMENT

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Resources Defense Council, Inc.,* 555 U.S. 7, 24, 129 S. Ct. 249 (2008) (reversing grant of preliminary injunction). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id*. at 20. "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with [the] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a 'clear showing' that the plaintiff is entitled to relief." *Id*. at 22. Accordingly, "[a] preliminary injunction shall be granted only if the moving party clearly establishes entitlement to the relief sought." *Di Biase v. SPX Corp.,* 872 F.3d 224, 230 (4th Cir. 2017) (affirming denial of preliminary injunction). This requires the movant to "make a clear showing of each of [the] four elements." *Patch Rubber Co. v. Toelke*, 2013 WL 2948116 (E.D.N.C. 2013) (denying preliminary injunction).

**A. Plaintiffs are not likely to succeed on the merits.**

**1. The First Amendment Does Not Require Civil Authorities To Abdicate Control of their Jurisdictions.**

The rights provided for by the First Amendment are not absolute. "Even in a traditional public forum, the government may impose reasonable restrictions on the time, place, and manner

of protected speech." *ACLU of Colo. v. City & County of Denver*, 569 F. Supp. 2d 1142, 1161 (D. Colo. 2008) (citing *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)). Restrictions on the First Amendment are constitutional if: (1) they are content-neutral; (2) "they are narrowly-tailored to serve a significant government interest"; and (3) there are "ample alternative channels for communication of the desired message." *Id*. (citing *Ward*, 491 U.S. at 791).

Content-neutral regulations (i.e., regulations where the justification for the restriction at issue does not pertain to the content of the regulated speech) are "subject to less stringent review that is more deferential to the government[] . . . [because] 'content-neutral regulations do not pose the same inherent dangers to free expression that content-based regulations do.'" *Id*. at 1162 (quoting *Turner Broadcasting System, Inc. v. F.C.C.*, 520 U.S. 180, 213 (1997)). Further, content-neutral regulations are permissible even where they may affect only certain speakers and not others. *Id*. (citing *Ward*, 491 U.S. at 791).

Content-neutral restrictions on speech must also be "narrowly tailored to serve a significant governmental interest." *Ward*, 491 U.S. at 796. Governmental interests that have been deemed "significant" include protecting city streets and parks from excessive noise (*see Ward*, 491 U.S. at 796-97); maintaining public places for the enjoyment of the general population (*see Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 296 (1984); and preserving order and public safety (*see Schenck v. Pro-Choice Network of Western New York*, 519 U.S. 357, 375-76 (1997).

To meet the "narrowly-tailored" requirement, the restriction must not "burden substantially more speech than is necessary to further" the government's stated interest. *Turner Broadcasting*, 520 U.S. at 214. That is, courts examine whether "the regulation is a sufficient 'fit' to the problem that it is intended to prevent, and then the court determines whether the

regulation burdens more speech than is necessary to achieve that fit." *ACLU of Colo.*, 569 F. Supp. 2d at 1163. In conducting this analysis, a content-neutral regulation will not be invalidated "simply because there is some imaginable alternative that might be less burdensome on speech." *Turner Broadcasting*, 520 U.S. at 217.

Finally, the regulation must allow "ample alternatives" for the speech at issue. The Fourth Circuit has stated that the "available alternatives need not be the speaker's first or best choice or provide the same audience or impact for the speech." *Reynolds v. Middleton*, 779 F.3d 222, 232, n.5 (4th Cir. 2015). Rather, the applicable standard is whether the regulation at issue "provides avenues for 'the more general dissemination of a message.'" *Ross v. Early*, 746 F.3d 546, 559 (4th Cir. 2014) (quoting *Green v. City of Raleigh*, 523 F.3d 293, 305 (4th Cir. 2008)). Stated another way, "the alternatives must be adequate." *Reynolds*, 779 F.3d at 232, n.5.

2. **Graham's July 10 Emergency Declaration Was Not Unconstitutional.**

Plaintiff's failed to demonstrate that Graham's emergency declaration suppressed any speech. It did not. Regardless, even if they had made such a prima facie showing, Graham's declaration survives constitutional scrutiny. Graham's July 10 declaration is facially neutral. It does not mandate that barricades be used to frustrate or impede anyone with a particular viewpoint. To the contrary, the SOE issued and barricades erected precisely so Plaintiffs could proceed safely to the Confederate monument without vehicles traversing their march route. Graham had a significant government interest in protecting Plaintiffs' members from getting run over on their march and at the protest site. Finally, there were ample "alternatives" for communication. This breaks down though since there were no restrictions by Graham; Plaintiffs protested directly underneath the Confederate Monument – which was the focal point of their protest.

Similarly, the ban on the use of weapons downtown prohibited everyone from using weapons downtown during a time of high tensions when law enforcement personnel had intelligence of threatened violence and where neighboring communities had recently undergone violent protests that caused significant damage to property. The emails from Plaintiff's attorney, Ms. Haddix, further demonstrate that concerns over violence were not fabricated but were in fact shared by Plaintiffs and their attorney.

The emergency declaration was in place only so long as necessary to accommodate and protect Plaintiff's march and protest – two days. It has long since been rescinded with no imminent plans to reinstate it. The issue, if ever there was an issue, is moot. The declaration was also constitutionally secure.

3. **The City of Graham is not involved with Plaintiff's efforts to Protest on the County Courthouse Steps or on the Confederate Memorial.**

The law is quite clear that authorities are not required to allow protestors to engage in dangerous activities or access public property where there is a reasonable apprehension of violence, damage being caused and/or threats to public safety, such as by toppling an elevated cement statue weighing approximately a ton in a crowded downtown square. "Neither the Constitution of the United States nor the Constitution of this State requires the authorities to delay such action until fires have been ignited and rioting has commenced." *State v. Dobbins*, 277 N.C. 484, 499-500, 178 S.E.2d 449, 458 (1971) (rejecting numerous constitutional challenges and upholding validity of conviction under emergency municipal order prohibiting carrying of weapons in city during time of race riots); *see also United States v. Nieves,* No. 18-CR-835 (OTW), 2019 U.S. Dist. LEXIS 48190, at *11 (S.D.N.Y. Mar. 22, 2019) ("The Government has a substantial interest in protecting the physical security of government property and advancing esthetic values.")*; ACLU of Colo. v. City & County of Denver*, 569 F. Supp.2d. at

1161 – 1171 (upholding restrictions on protest locations; survey of cases therein). Regardless, the City has played no role in regulating whether or how individuals may access the Confederate monument or the Alamance County Courthouse. Further, the City has allowed and continues to allow ongoing daily protests in downtown Graham on the sidewalks across the street from the disputed county properties.

### B. Plaintiffs are not suffering irreparable harm.

The City of Graham is not preventing Plaintiffs from protesting on the sidewalks surrounding the downtown traffic circle. The City has no control over or policies regarding access to the monument or the county courthouse. Similarly, Graham has no emergency declaration in place, seeking to protect Plaintiffs, or otherwise. None is presently contemplated.

In fact, Plaintiffs protest daily from the sidewalks surrounding the memorial and courthouse. As the aforementioned Facebook video Ms. Haddix sent from July 28 shows, contrary to shutting down protestors, the GPD demonstrates professional restraint in the face of protestors' obscenity laced criticism for checking whether the spray paint protesters used to write on the sidewalk was chalk or paint based. The City of Graham has labored earnestly and apparently, thanklessly, to protect the very rights they now stand accused of suppressing. There is nothing in the record supporting the argument that an emergency injunction should be imposed against the City of Graham.

### C. The Balance of Equities and Public Interest Favor the City of Graham.

This court should not condone "gotcha" litigation tactics. Plaintiffs have now repeatedly petitioned this court for emergency relief without any effort to confer with the attorneys for Defendants. In neither instance was emergency relief necessary. Such tactics and hyperbolic claims should not be condoned under the best of circumstances. As businesses reel from the

13

Covid-19 shutdowns and city centers around the country smolder from racial tensions and violence, these are far from the best of times.

Before this court, Plaintiffs have repeatedly disparaged the City of Graham and its police department, effectively calling them out as racists and neo-confederate sympathizers. Outside this proceeding, the GPD has worked strenuously and alongside Plaintiffs to accommodate *and to protect* Plaintiffs and their efforts to peaceably demonstrate. The small GPD has itself incurred over one thousand hours in overtime the past few months working around the clock to accommodate Plaintiff's demonstration rights despite serious difficulties associated with Covid-19 absences. Indeed, GPD cordoned off traffic and shut down the entirety of downtown Graham to accommodate Plaintiff's July 11 march and protest, helped Plaintiffs erect a stage in the shadows of the Confederate monument, and cordoned off counter protestors. Plaintiffs responded days later by amending their complaint to accuse Graham of conspiring to suppress their protests. Such conduct is not equitable.

The City of Graham respectfully suggests that this court should strongly encourage, if not require, Plaintiffs to engage in a meaningful meet and confer process for any remaining and any future issues before engaging in further emergency motion practice.

## CONCLUSION

For the reasons set forth above and in the declarations submitted herewith, the City of Graham prays this court deny Plaintiffs' motion against the City and its individuals that Plaintiffs have brought into this lawsuit.

14

Respectfully submitted this the 30th day of July, 2020.

**Michael Best & Friedrich LLP**
**Attorneys for Jerry Peterman, Chip Turner,**
**Melody Wiggins, Jennifer Talley, Ricky Hall,**
**Frankie Maness and Jeffrey Prichard**

By: /s/ *Anthony J. Biller*
Anthony J. Biller
NC State Bar No. 24,117
2501 Blue Ridge Road, Suite 390
Raleigh, NC 27607
Telephone: (984) 220-8749
Facsimile: (877) 389-5240
Email: ajbiller@michaelbest.com

# CERTIFICATE OF SERVICE

I hereby certify that on this the 30th day of July, 2020, the foregoing **RESPONSE IN OPPOSITION TO MOTION FOR TEMPORARY RESTRAINING ORDER** was filed using the Court's CM/ECF filing system, which will provide notice of the filing to all counsel of record as follows:

Kristi L. Graunke
Daniel K. Siegel
**ACLU OF NORTH CAROLINA**
PO 28004
Raleigh, NC 27611
Email: kgraunke@acluofnc.org
dsiegel@acluofnc.org

Emerson J. Sykes
Vera Eidelman
**AMERICAN CIVIL LIBERTIES UNION FOUNDATION**
125 Broad St., 18th Floor
New York, NY 10004-2400
Email: esykes@aclu.org
veidelman@aclu.org

William L. Hill
**FRAZIER HILL & FURY, RLLP**
PO 1559
Greensboro, NC 27402
Email: whill@frazierlawnc.com

Curtis Scott Holmes
**BROCK PAYNE & MEECE, PA**
3130 Hope Valley Road
Durham, NC 27707
Email: scott.holmes@bpm-law.com

Elizabeth Haddix
Mark Dorosin
**LAWYERS COMMITTEE FOR CIVIL RIGHTS**
Under Law Regional Office
P.O. Box 956
Carrboro, NC 27510
Email: ehaddix@lawyerscommittee.org
mdorosin@lawyerscommittee.org

Clyde B. Albright
**ALAMANCE COUNTY ATTORNEY**
124 West Elm Street
Graham, NC 27253
Clyde.Albright@alamance-nc.com

/s/ Anthony J. Biller
Anthony J. Biller
N.C. State Bar No. 24,117
2501 Blue Ridge Road, Suite 390
Raleigh, NC 27607
Telephone: (984) 220-8750
Facsimile: (877) 398-5240
Email: ajbiller@michaelbest.com

*Attorney for Jerry Peterman, Chip Turner, Melody Wiggins, Jennifer Talley, Ricky Hall, Frankie Maness and Jeffrey Prichard*