IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
Civil Action No. 1:10CV613

| | | |
|---|---|---|
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE ALAMANCE COUNTY BRANCH, et al. | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | 1:20-CV-613 |
| JERRY PETERMAN, et al., | ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Catherine C. Eagles, District Judge.

The plaintiffs move for a temporary restraining order and a preliminary injunction restraining the defendants from prohibiting protests in the immediate vicinity of the Alamance County Courthouse. The plaintiffs are likely to be successful on their claims that the County defendants are violating their First Amendment rights by prohibiting protests on the steps, grounds, and sidewalks surrounding the Historic Alamance County Courthouse, and they are likely to suffer irreparable harm absent preliminary relief. While it is highly likely that the Court will ultimately conclude that the equities and the public interest favor a preliminary injunction, the Court concludes that they do not favor a temporary restraining order. The precise wording of the injunction needs further consideration, and it seems advisable to give the defendants a short period of time to plan for entry of the preliminary injunction and, if they choose, to develop reasonable time,

1

place, and manner restrictions to protect public safety and county property during ongoing protests on courthouse grounds. Therefore, the motion for a temporary restraining order will be denied and the motion for preliminary injunction remains pending subject to further evidence and briefing.

## PROCEDURAL HISTORY

This case began on July 2, 2020, when the plaintiffs filed a complaint and a motion for temporary restraining order and preliminary injunction directed towards enforcement of an ordinance enacted by the City of Graham that governed parade and protest permits. *See* Docs. 1, 2. The plaintiffs are the Alamance County Branch of the National Association for the Advancement of Colored People and several individuals actively engaged in protesting against a monument outside the Alamance County Historic Courthouse in Graham, North Carolina. Doc. 27 at ¶¶ 14–22. The defendants fall into two groups: the City Defendants—the mayor, city council members, city manager, and police chief for the City of Graham—and the County Defendants—the Sheriff, county commissioners, and county manager for Alamance County. *Id.* at ¶¶ 23–36.

Shortly before a scheduled hearing, the parties agreed to a consent TRO enjoining enforcement of the contested City ordinance, *see* Doc. 11, which was entered. Doc. 15. Soon thereafter on July 14, the City repealed the ordinance at issue. Doc. 27-1. The plaintiffs withdrew their motion for preliminary injunction, Doc. 23, as it had become moot. *See* Doc. 24.

On July 17, 2020, the plaintiffs filed an amended complaint directed at what they allege are continued actions by the defendants to suppress their First Amendment rights,

2

as well as the rights of other protestors, by prohibiting protests around the Alamance County Courthouse and by imposing restrictions on protests by the repeated issuance of "State of Emergency Declarations." *See* Doc. 27 at ¶¶ 5–10. The pending motion for a Temporary Restraining Order was filed on July 28, 2020 and is directed towards both practices. Doc. 47. The City of Graham defendants filed a written response with evidence, Docs. 53, 53-1–53-4, as did the Alamance County defendants. Docs. 54, 54-1–54-9. A hearing was held on July 30, 2020. Minute Entry 07/30/2020. Following the hearing, the plaintiffs filed a reply brief, Doc. 55, and the County Defendants filed a sur-reply. Doc. 56.

At the hearing, the plaintiffs clarified that the request for a TRO related to the Emergency Declarations was directed towards the City Defendants, and the request for a TRO related to access to the space immediately outside the courthouse was primarily, but not exclusively, directed to the County Defendants.

At the conclusion of the hearing, the Court denied the motion to the extent it was directed against the City Defendants, based on facts found and reasons stated in open court; that aspect of the pending motion will not be addressed further here. *See* Minute Entry 07/30/2020. The Court took the motion under advisement to the extent it was directed against the County Defendants, which this Order now resolves.

## FINDINGS OF FACT

For purposes of this Order only, the Court makes the following findings of fact, after consideration of all the evidence submitted. As is necessary and in the context of specific issues, the Court will address and find other relevant facts throughout this Order.

3

The plaintiffs regularly attempt to exercise their First Amendment rights to protest, assemble, and associate in Graham, and recently they have organized, engaged in, or attempted to organize or engage in protests against institutionalized racism, police violence against Black people, and the continued presence of a Confederate monument in front of the Alamance County Historic Courthouse[1] in Graham. The Alamance NAACP has planned and organized such protests, Doc. 2-1 at ¶¶ 7–8, and many of the individual plaintiffs have participated in vigils, rallies, protests, and other expressive acts directed against systemic racism and the Confederate monument. *See, e.g.*, Doc. 2-2 at ¶ 3; Doc. 2-3 at ¶ 6; Doc. 2-4 at ¶ 3; Doc. 47-8 at ¶ 2; Doc. 50-1 at ¶¶ 2–6. On some of these occasions, counter-protesters who favor keeping the monument in place have also appeared. Doc. 2-6 at ¶¶ 20–21; Doc. 53-3; Doc. 52 at ¶¶ 26, 44; Doc. 54-9 at ¶ 8.

The Historic Alamance County Courthouse is located in the center of downtown Graham. *See* Doc. 50-1 at ¶ 7; Doc. 48 at 2; Doc. 53 at 2. It is a working courthouse that is open Monday through Friday. Doc. 52 at ¶ 17. The courthouse sits in the middle of a square, on a relatively small piece of land. Doc. 50-1 at ¶ 7. There are small open spaces on each corner with what appears to be grass and trees, which the Court will refer to as the courthouse grounds. *Id.*; Doc. 52 at ¶ 17 (characterizing the space as "small 'lawns'"). The courthouse and these grounds are surrounded by a sidewalk and parking spaces, which are themselves surrounded by what is essentially a vehicular roundabout. Doc. 50-1 at ¶ 7.

---

[1] All references in this opinion are to the Historic Courthouse, not to the other, newer courthouses in Alamance County.

Highway 87, also known as Main Street, enters and exits the square from the south and north, and Elm Street enters and exits the square from the west and the east. Doc. 50-1 at ¶ 7. There are businesses and sidewalks around the outside of the square with on-street parking, and vehicular traffic circles the courthouse inside the square. *Id.*; Doc. 52 at ¶ 19. There is a small park, known as Sesquicentennial Park, on the northwest corner of the square, caddy-cornered from the courthouse. Doc. 50-1 at ¶¶ 2, 6–7.

There are four pedestrian crosswalks providing access from the outer rim of sidewalks to the sidewalks surrounding the courthouse, one on each side of the building. Doc. 50-1 at ¶ 7; Doc. 52 at ¶ 17. The only functioning entrance to the courthouse is on the northern side of the building; this entrance is accessed by ascending a number of wide steps. Doc. 54-9 at ¶ 5.

Outside of the northern entrance to the courthouse is a large Confederate monument. Doc. 50-1 at ¶ 7. One of the crosswalks runs beside the monument, connecting the sidewalk around the courthouse with the northwestern and northeastern corners of the town square. *Id.* The monument itself is surrounded by a small, decorative chain fence and a raised curb which encloses small landscaped flower beds at the base of the statue. *Id.* at ¶¶ 7–8. Between the flower bed and the sidewalk outside the courthouse steps, there is a paved area level and in line with the parking spaces, but no vehicles travel between the statute and the courthouse and it is not used as a parking space. *See id.* at ¶ 7; Doc. 54-9 at ¶ 6. For purposes of this Order, this paved area between the sidewalk and the monument is considered part of the sidewalk.

5

Highway 87 is a state highway. Doc. 54-9 at ¶ 3. Elm Street is a city street. The courthouse, the grounds inside the sidewalks, the monument itself, and the small piece of land currently planted with flowers which surrounds the monument are owned and controlled by Alamance County. *Id.* at ¶ 6; *see* Doc. 52 at ¶¶ 14–15. The Alamance County Sheriff's Office is responsible for law enforcement on courthouse grounds and other county property, Doc. 54-9 at ¶ 4, and the Sheriff and his deputies routinely police the public sidewalks immediately adjacent to the courthouse. Doc. 52 at ¶ 15.[2]

Demonstrations and protests have historically been held on the courthouse steps and in the spaces immediately outside and around the courthouse. Doc. 2-9 at ¶ 7; Doc. 50-1 at ¶ 18; Doc. 52 at ¶ 14; Doc. 54-9 at ¶ 7. The courthouse steps and grounds and the sidewalks immediately surrounding the courthouse are a traditional public forum. *See* Doc. 48 at 14; Doc. 53 at 9–10; Doc. 54 at 6.

After the death of George Floyd at the hands of a police officer in May, protests near the courthouse increased. Doc. 52 at ¶¶ 6, 9–10. In late May and early June, law enforcement in Graham and Alamance County became aware of news reports of violence and property damage during protests in Fayetteville, Greensboro, and Raleigh, larger cities not far from Graham. *Id.* at ¶¶ 32–34; Doc. 54-9 at ¶ 9. According to news reports, these incidents included a fire that damaged the Guilford County Courthouse in Greensboro, Doc. 54-9 at ¶ 9; vandalization and rock throwing in Greensboro, Doc. 52 at

---

[2] The Acting Police Chief testified that although the Sheriff of Alamance County contends these sidewalks are under County control, she does not actually agree that is so. The evidence is not clear that the County owns the sidewalks. The evidence is equally ambiguous about the paved space between the sidewalk and the monument.

6

¶ 33; property damage and looting in Raleigh, *id.* at ¶ 32; and unspecified violence and looting in Fayetteville. *Id.* at ¶ 34. There is some evidence that there were a few threats of property damage in Graham, *see id.* at ¶ 49; Doc. 54-9 at ¶ 10; Doc. 52-1 at 5, but there is no evidence of actual property damage in or around the courthouse square.

At some point around this time, the Alamance County Sheriff's Office decided to deny access to the grounds immediately surrounding the courthouse to all protest groups. Doc. 54-9 at ¶ 11. The Sheriff's Office considers this to be a "temporary policy" intended to stay in place "during this time of heightened tension" and "while the political process plays out." *Id.* The Sheriff's Office considers this total prohibition to be necessary in light of the violence and property damage in other North Carolina cities, the difficulty in ensuring the safety of protestors and the public given the limited space on the courthouse grounds inside the roundabout if two competing groups both wish to have access to the location at the same time, and the need to prevent conflict on the courthouse grounds from escalating into violence or destruction of property. *Id.* at ¶¶ 9–11.

While the scope of the prohibition is not entirely clear, as best the Court can tell, the Sheriff prohibits any protestors on the courthouse steps, the sidewalks immediately adjacent to and surrounding the courthouse, the space between the sidewalk and the monument, the crosswalk beside the monument, and on or beside the monument itself. *See* Doc. 54-9 at ¶¶ 11, 13. The prohibition remains in place to date and has been in place for approximately two months.[3]

---

[3] In their reply brief, the Plaintiffs refer to a July 31 announcement on the Sheriff's Facebook page prohibiting protest on the north side of the courthouse or anywhere else for the first

7

Until recently, the City of Graham had an ordinance requiring protestors to obtain a permit from the city before they could protest in downtown Graham. *See* Doc. 52 at ¶¶ 7–8. The Graham City Police Department was involved in the issuance and enforcement of the permitting ordinance. *Id.*

In late June to early July, the City of Graham Police Department began either refusing to issue any permits for protests, *see, e.g.,* Doc. 2-7 at ¶ 17 (June 26 application); Doc. 2-9 at ¶¶ 3, 6 (July 1 application), or significantly limiting such permits. *See* Doc. 52 at ¶ 9 (noting permitted protests on June 19, June 30, and July 1). While not completely clear from the record, it appears that these denials or refusals to act occurred both during a "state of emergency" proclaimed by the mayor and after the "state of emergency" ceased.

Despite the absence of permits, individual plaintiffs engaged in protests or attempted to engage in protests. *See, e.g.,* Doc. 2-2; Doc. 2-9. On June 28, a single protester approached the vicinity of the courthouse with a protest sign and was threatened with arrest by a Graham police officer if she did not leave the area. Doc. 2-5 at ¶¶ 2–10. Once she threw away her protest sign, the officer ceased his threats of arrest and left her alone. *Id.* Another lone protester approached the courthouse at 6 a.m. on June 27, a

---

weekend in August. Doc. 55 at 1 n.1. They did not provide a screen shot of the announcement, much less evidence authenticating a screen shot. Statements in a brief are not evidence. *Adjabeng v. GlaxoSmithKline, LLC,* No. 1:12-CV-568, 2014 WL 459851, at *3 (M.D.N.C. Feb. 5, 2014) (collecting cases). And, as the County defendants point out in their sur-reply, the brief does little more than characterize the post, rather than providing its language in full. *See* Doc. 56. The Court has not considered counsel's characterization of the Facebook post, and the Court has not accessed the post online.

8

Saturday, where he was surrounded by several Alamance County Sheriff's Office cars and eight to ten Sheriff deputies who threatened him with arrest if he did not leave the area. Doc. 2-4 at ¶¶ 3–13. Eventually he was allowed to protest on a nearby sidewalk, so long as he was alone. *Id.* at ¶¶ 11, 14.

After the consent TRO was entered on July 6 prohibiting the defendants from enforcing the parade permitting ordinance, Doc. 15, the City of Graham repealed the permitting ordinance on July 14. Doc. 27-1; Doc. 51 at ¶ 6. Since then, protesters have continued to regularly appear at the courthouse square. *See* Doc. 52 at ¶¶ 9–10. The protestors regularly gather in Sesquicentennial Park, on the northwest corner of the square, Doc. 50-1 at ¶¶ 2, 6–7; Doc. 54-9 at ¶ 13, and, while not completely clear, the Court infers that protestors are allowed on the sidewalks on the outer rim of the square. *See* Doc. 2-4 at ¶¶ 13–14; Doc. 54-9 at ¶ 7.

Gregory Drumwright, one of the plaintiffs, obtained permission from the State Department of Transportation to close Highway 87 around the north side of the courthouse on July 11 for the Burlington-Graham March for Justice and Community, which ended with a rally at the northern intersection of the courthouse square. Doc. 27 at ¶ 187; Doc. 47-8 at ¶ 2; Doc. 52 at ¶ 20. The City of Graham arranged for barricades to block vehicular traffic so that the protest could safely take place. Doc. 52 at ¶¶ 20, 21, 22, 42. Graham City Police received information that counter-protestors planned to attend the July 11 protest in order to "protect[] the Confederate monument," and there was reason to believe these individuals would bring weapons in furtherance of that purpose. *Id.* at ¶¶ 37–39. In advance of the protest, the mayor for the City of Graham

9

issued a State of Emergency Declaration on July 10. *Id.* at ¶ 40; Doc. 53-1. The Emergency Order made it unlawful to "disobey any barriers, warning signs or other structures that restrict vehicular or pedestrian travel due to road closure, detours and/or hazardous conditions" and prohibited the use of "dangerous weapons" and unlawful substances. Doc. 53-1. The Emergency Order was in effect for the July 11 protest and was rescinded on July 12. Doc. 53-4.

In advance of the July 11 protests, and consistent with its policy of prohibiting protests on courthouse grounds, Sheriff's deputies blocked access to the monument, the sidewalks around the courthouse, the crosswalk, and courthouse grounds, using barricades and police tape. Doc. 47-8 at 2–3. Protestors[4] set up a stage in the street in front of the monument. *Id.*; Doc. 54-9 at ¶ 14.

The July 11, 2020 demonstration involved approximately 520 protestors and counter-protestors. Doc. 52 at ¶ 26; *see* Doc. 54-9 at ¶ 14. When protestors arrived on the morning of July 11, Alamance County Sherriff deputies were stationed around the courthouse and informed protestors they were prohibited from accessing the grounds, steps, and sidewalks. Doc. 47-8 at ¶ 3.[5]

---

[4] For clarity and brevity, the Court refers to individuals attending in support of the Burlington-Graham March for Justice and Community as "protestors," and refers to individuals opposed to this demonstration and in support of keeping the monument as "counter-protestors." In the past, protests have been arranged by the supporters of the monuments, and persons opposed to the monument have been counter-protestors.

[5] The evidence is not clear about whether and to what extent Graham police officers also informed protestors they were prohibited from accessing the grounds. *See* Doc. 47-8 at ¶ 3; Doc. 52 at ¶ 14, 42.

A Graham Police Department officer escorted one protestor across the "safety zone" by the courthouse to retrieve something from a vehicle. Doc. 52 at ¶ 46. While returning through part of the courthouse square that was closed to traffic, the protestor was arrested by Alamance Sheriff deputies. *Id.*; Doc. 47-8 at ¶ 6. Alamance County Sheriff deputies arrested at least one more individual at the July 11 protest for trespassing, failure to disperse, and disorderly conduct. Doc. 54-9 at ¶ 14.

A number of counter-protestors were also present at the July 11 protest. *Id.* at ¶ 15; Doc. 54-4. While there were threats of violence made by counter-protestors beforehand on social media, Doc. 52-1, there is no evidence of any violence between the protestors and counter-protestors at the July 11 event.

On Saturday, July 25, protestors, including some of the plaintiffs, demonstrated in Graham. *See* Doc. 50-1. Sheriff deputies arrested four protestors, including one of the plaintiffs. *Id.* at ¶¶ 10–12. According to one of the protestors, he walked over towards the monument and stood on the concrete curb separating the flower bed around the monument from the crosswalk; a sheriff's deputy told him he could not stand there and instructed him to leave the courthouse space; and when he refused, he was arrested. *Id.* at ¶ 9. The charging document shows that the protestor was charged with loitering in the traveled portion of a state highway or street and resisting an officer who was discharging his duty to keep individuals from loitering on the street or highway. *Id.* at 8.

Despite tensions between protestors and counter-protestors, the protests have been overwhelmingly peaceful. Doc. 52 at ¶ 44. Two pro-monument protestors were arrested for simple assault and disorderly conduct on June 2, *see id.*, two people were arrested

11

following a physical altercation on June 21, Doc. 54-9 at ¶ 8, and one person was arrested for carrying a weapon at a protest. *Id.* at ¶ 10. Otherwise, there is no evidence of actual violence. There is also no evidence that any property has been defaced or destroyed during any of the protests. There have, however, been a few threats of violence; including the use of weapons, and a few threats to damage the monument on social media. *See, e.g.*, Doc. 52-1; *see also* 54-9 at ¶¶ 9–10.

## ANALYSIS AND CONCLUSIONS OF LAW

To obtain a temporary restraining order, the plaintiffs must demonstrate that they are likely to succeed on the merits; they are likely to suffer irreparable harm absent preliminary relief; the equities favor a temporary restraining order; and a temporary restraining order serves the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

### I. Likelihood of Success on the Merits

The First Amendment prohibits the enactment of laws "abridging the freedom of speech . . . or the right of the people to peaceably assemble . . . ." U.S. CONST. amend. 1; *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). Under long-established First Amendment law, governmental entities are "strictly limited" in their ability to regulate private speech in public fora. *Pleasant Grove City v. Summum*, 555 U.S. 460, 469 (2009); *Davison v. Randall*, 912 F.3d 666, 681 (4th Cir. 2019), *as amended* (Jan. 9, 2019). When the government maintains property which has been used as a traditional public forum for the expression of opinions, the government is required to accommodate all speakers and may only restrict the time, manner, and place of speech. *See, e.g., Am.*

12

*Civil Liberties Union v. Mote*, 423 F.3d 438, 443 (4th Cir. 2005). Such restrictions must be content-neutral, narrowly drawn to serve a significant state interest, and leave open ample channels of communication of the information. *Id.* "Additional restrictions such as an absolute prohibition on a particular type of expression will be upheld only if narrowly drawn to accomplish a compelling governmental interest." *United States v. Grace*, 461 U.S. 171, 177, (1983).

"Sidewalks, of course, are among those areas of public property that traditionally have been held open to the public for expressive activities and are clearly within those areas of public property that may be considered, generally without further inquiry, to be public forum property." *Grace*, 461 U.S. at 179; *accord Occupy Columbia v. Haley*, 738 F.3d 107, 121 (4th Cir. 2013) (treating area outside South Carolina State House as a public forum for First Amendment purposes); *see also O'Connell v. Town of Burgaw*, 262 F. Supp. 3d 316, 320 (E.D.N.C. 2017) (finding the Pender County Courthouse Square and its surrounding public streets and sidewalks was a public forum). For purposes of this motion, it is undisputed that the courthouse steps, the sidewalks surrounding it, including the paved space between the sidewalk and the monument, and the grounds at the courthouse corners are a traditional public forum. *See* Doc. 54 at ¶ 18.

The Sheriff's policy prohibits all protests on the courthouse steps, grounds, and sidewalks, regardless of content, and in this sense it is content-neutral. *See generally Ross v. Early*, 746 F.3d 546, 550, 552 (4th Cir. 2014) (finding a city policy that applied to all protestors was content-neutral). The plaintiffs have not contended otherwise for purposes of this motion. *See* Doc. 48.

13

It is highly doubtful that the Sheriff's total prohibition on protests on the sidewalks, grounds, and steps of the courthouse, should it continue, will survive scrutiny. The Supreme Court has held that a total prohibition against protests on the sidewalks surrounding a courthouse is unconstitutional where the prohibition does not sufficiently serve those public interests that are urged as its justification. *Grace*, 461 U.S. at 181. The Supreme Court acknowledged "the necessity to protect persons and property or to maintain proper order and decorum" within a courthouse's grounds but noted that a "total ban" on protests which do not "obstruct[ ] the sidewalks or access to the Building, threaten[ ] injury to any person or property, or in any way interfere[ ] with the orderly administration of the building or other parts of the grounds" is "no more necessary for the maintenance of peace and tranquility on the public sidewalks surrounding the [courthouse] than on any other sidewalks in the city." *Id.* at 182.

The County defendants contend that the need to prevent damage to the courthouse and to protect the public justify the total prohibition. Doc. 54-9 at ¶11. The County defendants must show that the proffered harms are "real, not merely conjectural," and that the policy "alleviate[s] these harms in a direct and material way." *Satellite Broad. & Comm'cns Ass'n v. F.C.C.*, 275 F.3d 337, 356 (4th Cir. 2001) (quoting *Turner Broad. Sys. v. F.C.C.*, 512 U.S. 622, 664 (1994).[6] But here, just as in *Grace*, there is no evidence of any obstruction of the sidewalks or access to the courthouse. There is no evidence that protests have ever disrupted the ordinary functions at the courthouse or even that protests

---

[6] The Court omits internal citations, alterations, and quotation marks throughout this opinion, unless otherwise noted. *See United States v. Marshall*, 872 F.3d 213, 217 n.6 (4th Cir. 2017).

14

have ever taken place at times when the courthouse is open for operation. Like *Grace*, there is no evidence that the plaintiffs here have threatened injury to any person or have interfered with the orderly administration of the building. There is limited evidence of a very small number of vague threats of property damage, *see* Doc. 54-9 at ¶ 10; Doc. 52 at ¶ 49, but it is not recent. Likewise, the evidence of property damage in other cities and counties is now many weeks old. A total prohibition on protests on the courthouse grounds is an extreme remedy, it is not narrowly tailored, and it does not sufficiently serve these proposed justifications. *Grace*, 461 U.S. at 182.

The County defendants also point out that the space around the monument, which is the focus of the protests, is small and that conflict is likely to result from allowing protestors and counter-protestors access to the space between the monument and the courthouse. If that is so, and it appears to be, the County is free to impose reasonable time, place, and manner restrictions on protests in this small space.[7] But a total, long-term prohibition is not a reasonable time, place, and manner restriction.[8] *See Ward v. Rock Against Racism*, 491 U.S. 781, 800 (1989). The plaintiffs are likely to prevail on

---

[7] At the July 30 hearing, the County defendants suggested that they had not yet enacted a reasonable time, place, and manner restriction in part because the plaintiffs had not been willing to communicate with them about what restrictions would be agreeable to the plaintiffs. It is the defendants' obligation to act within the bounds of the Constitution, and the County defendants cannot prolong an unconstitutional practice because the plaintiffs have not told them how to conform to the Constitution.

[8] That said, it may be that when there is a short-term and immediate, real threat to property or persons, a total short-term prohibition may be appropriate. But that is not the case here, and the Court need not decide that issue.

15

the merits of their claim that the Sheriff's total ongoing prohibition on protests on the steps, grounds, and sidewalks surrounding the courthouse is unconstitutional.

To the extent the plaintiffs contend that the narrow curb separating the monument flower beds from the street on the north, a parking space on the east, the area between the monument and the sidewalk on the north, and the crosswalk on the west is a traditional public forum, the present record does not support that conclusion. There is no evidence that the government has historically "made the space available—either by designation or long-standing custom—for 'expressive public conduct' or 'expressive activity,' and the space is compatible with such activity." *Davison*, 912 F.3d at 681 (quoting *Am. Civil Liberties Union v. Mote*, 422 F.3d 438, 443 (4th Cir. 2005)).[9] To this narrow extent, the plaintiffs have not established that they are likely to prevail on the merits.

## II. Irreparable Injury

"[L]oss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373–74 (1976). The plaintiffs here have already been denied their First Amendment free speech rights for some weeks by the total prohibition of protests on the courthouse grounds. The issues are matters of intense public interest and discussion in the here and now. The

---

[9] The Court does not understand the plaintiffs to contend that they have a First Amendment right to protest on the monument itself or on the flower beds surrounding it. There is no evidence in the record that the monument itself or the flowers beds are a public forum. Nor does the Court understand the plaintiffs to contend that they have a First Amendment right to protest in the crosswalk running beside the monument. If this is not correct, the plaintiffs can address it in the supplemental briefing the Court is authorizing *infra* on the motion for preliminary injunction.

16

Case 1:20-cv-00613-CCE-LPA Document 57 Filed 08/07/20 Page 16 of 19

plaintiffs are thus likely to suffer irreparable injury. This injury is imminent and immediate, as the plaintiffs have ongoing plans for protests about and near the monument, as they have been blocked from accessing the courthouse grounds, and as they have been threatened with arrest if they attempt to pass through the Sheriff's barricades.

### III. Balance of Equities and the Public Interest

An injunction of a likely unconstitutional governmental practice ordinarily does not harm the state, *see Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002), and upholding constitutional rights "surely serves" the public interest. *Id.* On the other hand, the circumstances here are unusual. The Court concludes in its discretion that on these unusual facts, the balance of the equities and the public interest favor denying the motion for temporary restraining order. *See In re Search Warrant Issued June 13, 2019*, 942 F.3d 159, 171 (4th Cir. 2019) (noting the decision whether to grant preliminary injunctive relief is within the discretion of the court).

While there is no evidence that the plaintiffs will engage in illegal conduct involving counter-protestors or property damage, there is some evidence that others may not share their restraint. There is evidence that counter-protestors may seek to harm protestors or engage in violence. *See* Doc. 52-1. The paved area immediately behind the monument, where protestors will most likely want to be, is quite small and is very near a well-travelled roundabout in regular use by cars and trucks. The evidence tends to indicate that some governmental management of access to the space immediately adjoining the monument would promote public safety for drivers using the roundabout as well as protestors and counter-protestors who might otherwise physically jockey for

17

space. Until very recently, the City of Graham had a permit requirement in place which restricted protests on the courthouse grounds to one group at a time, so the need for other time, place, and manner restrictions only recently became ripe. A short delay before entry of an injunction is appropriate to allow the defendants time to plan.

In addition, while the motion for preliminary injunction will almost certainly be granted absent a change in circumstances, the specific terms of that injunction require further consideration. Rule 65 requires that injunctions must "describe in reasonable detail . . . the act or acts restrained." Fed.R.Civ.P. 65(d)(1)(B). The language proposed by the plaintiffs refers only to "Courthouse grounds," *see* Doc. 47-10 at 19, which does not seem to be specific enough given the variety of spaces in and around the courthouse and the monument. It may also be appropriate to include language which recognizes the possibility of an emergency situation. The Court does not contemplate prohibiting the defendants from reasonable time, place, and manner restrictions. Supplemental briefing on the appropriate language will be helpful.

In view of the length of time the prohibition has been a place, the ongoing irreparable harm to the plaintiffs' First Amendment rights, and the fact that the existing briefs largely address most of the issues, the Court will allow only a short period of time for additional submissions on the motion for preliminary injunction.

## CONCLUSION

The plaintiffs have shown a likelihood of success on their claim that the Sheriff's total prohibition of protests on courthouse steps, sidewalks, and grounds violates their First Amendment rights, and they have established irreparable harm if injunctive relief is

18

not granted. But on the quite unusual facts here, the balance of the equities and the public interest favor a delay in the entry of injunctive relief so the defendants have time to plan and so that the precise wording of the injunction can be carefully crafted. In the meantime, a temporary restraining order should be denied. Absent a change of circumstances or other persuasive evidence or argument, the Court expects to grant the motion for preliminary injunction. A prohibition that has been in place for over two months and which the County defendants have shown no inclination to remove is not temporary, and a long-term prohibition of protests on property that has historically been used as a public forum is not constitutional.

If any party wishes to submit additional evidence or briefing in connection with the motion for preliminary injunction, it must be filed no later than August 12, 2020. The Court is particularly amenable to suggested language for enjoining language in the expected preliminary injunction. If any party files such evidence or briefing, the other party may file a reply brief and evidence no later than noon on August 14, 2020. In the absence of a change of circumstances or additional evidence undermining the Court's factual findings herein, the Court contemplates granting the motion for preliminary injunction against the County defendants.

This the 7th day of August, 2020.

UNITED STATES DISTRICT JUDGE